THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
JOSEPH BALDI, Appellant.

Second Department, June 16, 1980

### APPEARANCES OF COUNSEL

*Leon B. Polsky* and *William E. Hellerstein (Edward C. Wallace, Jr.,* of counsel), for appellant.

*John J. Santucci, District Attorney (Charles N. Walsh* of counsel), for respondent.

### OPINION OF THE COURT

LAZER, J.

At about 3:30 A.M. on June 17, 1972, Deborah Januszko, a girl of 15, was brutally knifed in the chest while sleeping in her ground floor bedroom. Before expiring, the girl told her parents (who had rushed to the room in response to her scream) that the assailant had stabbed her through an open window. Four days later, Joseph Baldi was arrested for the crime and allegedly re-enacted the murder three times at the police precinct house and a fourth time at the scene of the crime itself. It was shortly discovered that Baldi was being sought in connection with an existing indictment for attempted murder and some lesser crimes, that he had been adjudicated incompetent to stand trial on that indictment, and that following confinement to various mental institutions, he had been released in February of 1972 without the sanction of law enforcement authorities. Two weeks after the arrest for the Januszko slaying, the defendant's appointed attorney agreed to the delivery of his client to the District Attorney's office for further interrogation. During the course of two examinations at the prosecutor's office, Baldi is said to have re-enacted numerous murders and assaults. More than two years later, after trial by jury, the defendant was convicted on his earlier indictment. At a bench trial which followed, he was convicted of murder.

On this consolidated appeal from both judgments of convic-

tion, defendant raises two issues: (1) that his sanity was not established beyond a reasonable doubt; and (2) that he was deprived of the effective assistance of counsel. The latter issue not only implicates the standard or standards under which claims of ineffective assistance of counsel must be evaluated in this State, but it also compels us to examine how such claims are affected by considerations of trial strategy. Ultimately, we must decide the relationship between the harmless error doctrine and proof of ineffective assistance of counsel.

## I

The first of the judgments appealed stems from events which occurred in Woodhaven in Queens County during the predawn hours of September 5, 1971. The defendant originally was apprehended when two police officers, searching for a prowler, came upon him walking the street in dark clothes. When asked for identification, Baldi allegedly responded by attempting to shoot one of the officers. The gun having misfired, the policemen wrestled the six-foot four-inch defendant to the ground, disarmed him, and discovered that he possessed an automobile license, registration, and Social Security card in the name of Anna Heeseman. Awakened by the police, Mrs. Heeseman related that before retiring she placed her purse containing the three documents on the dining room table next to a closed window. Not only was the purse missing, but the window was open and the table cloth had been pulled the length of the table toward it.

The defendant was indicted for attempted murder, reckless endangerment in the first degree, burglary in the second degree, possession of weapons, etc., as a felony, criminal possession of stolen property in the third degree, and petit larceny, but after being jailed for 10 days and confined at the Kings County State Hospital for six to seven weeks, he was adjudicated incompetent to stand trial. Further successive confinements in two other mental institutions terminated with the defendant's release by Mental Hygiene officials in February, 1972, without notice to the proper authorities.[1]

Upon Baldi's arrest for the Januszko murder in June, 1972, he was questioned at the 16th District Precinct house by

1. The circumstances of Baldi's release subsequently became the focus of a civil suit by Deborah Januszko's parents (see *Januszko v State of New York,* 93 Misc 2d 1041, affd 61 AD2d 1077, affd 47 NY2d 774).

Detective Angelo Lamardo in the presence of two other detectives. According to testimony adduced at the ensuing trials, after telling the detectives that he had "cut" a girl and upon receiving assurances that he would not be harmed, the defendant picked up an imaginary object which appeared to be a square box on the floor in front of a mirror, made a climbing motion as though he were stepping up on it, raised his hands to the mirror and started feeling it with his hands. He then drew a second imaginary object from his pocket, raised his hand in the air, made a sudden stabbing motion, and, after wiping the object with his fingers, returned it to his pocket. The performance concluded with the defendant's collapse to the floor, but after a brief respite, he re-enacted the crime twice more. On the last occasion (which was tape-recorded) the defendant described the specifics of Deborah Januszko's room and what she was wearing when stabbed. Driven to the area of the crime, the defendant picked up and carried an imaginary box to the Januszko house, placed it next to a window in the alleyway, and appeared to re-enact the details of the crime.

The next day, while at Kings County State Hospital, Baldi received his first visit from the attorney appointed to represent him in connection with the Januszko charge and who subsequently defended him against the earlier indictment as well. Following this meeting, the attorney consented to the entry of a court order directing that his client be delivered to the District Attorney's office "for the purpose of cooperating with District Attorney's Office in connection with pending investigations." On July 7, 1972 the defendant was transported to the District Attorney's office where his counsel, Detective Lamardo, a number of other detectives, and a psychiatrist from Creedmoor State Hospital were present. When the attorney introduced himself to Baldi, the latter denied ever meeting him and had no recollection of their brief encounter at Kings County State Hospital. During the next several hours—which were tape-recorded—the defendant gave a detailed re-enactment of at least four murders, including that of Deborah Januszko. On July 14, 1972, the defendant again was taken to the District Attorney's office and, in the presence of his lawyer, Detective Lamardo, and Dr. Daniel Schwartz, director of forensic psychiatry at Kings County Hospital, gave further statements concerning the murders. Indictments for the four killings quickly followed.

## II

In April of 1973, Baldi was arraigned on the attempted murder indictment and on the four murder indictments. The psychiatric report rendered pursuant to CPL 730.30 concluded that the defendant was suffering from an unspecified personality disorder but that he did not lack the capacity to understand the trial proceedings or make his defense. These findings were accepted by defense counsel without a hearing and the defendant pleaded not guilty and raised the defense of insanity with reference to all of the indictments. In December of 1973, the defendant was remanded for further psychiatric examinations to determine his sanity at the time of the attempted murder. Although the record is somewhat obscure on this point, it seems to indicate that the resultant findings of sanity, rendered in January, 1974, were accepted solely to the extent that the defendant was found capable of standing trial. No hearing on the issue was demanded or conducted.

Prior to the onset of the defendant's trial in October, 1974 on the charge of attempted murder, another psychiatric examination was ordered and again the conclusion that the defendant was competent to stand trial was accepted by defense counsel without a hearing. The evidence presented by the prosecution included the police officers' description of their street encounter with the defendant and Mrs. Heeseman's description of her conduct before retiring for bed and her discovery when she awoke.

Testifying in his own defense, Baldi first described his own extensive history of mental illness, including commitment to Creedmoor State Hospital from 1962 to 1966. He denied pointing a gun at the policeman, however, asserting that he was wrestled down from the rear and that the only weapon in his possession was a "22 starting pistol" capable of firing "caps". Although the defendant acknowledged the presence of the Heeseman documents in his pocket, he explained that he had found them on the curb about a half block from where he was subsequently stopped and that he had intended to put them in a mailbox for return to the owner. The following questions were then put to the defendant by his own attorney:

"Q Did you on September 20, 1970, a year before you were arrested in this case, stab and kill Areti Koularmanis at 144-06 88th Avenue?

"A No. * * *

"Q Would it help you remember that you did it if I tell you that you told us you did it?

"A No.

"Q Would it help you remember if I told you that you showed us and moved about and re-did it again in front of our eyes? Would that help bring it to your mind?

"MR. GAUDELLI [Assistant District Attorney]: Object to this, Your Honor.

"THE COURT: No; let him answer it.

"A No.

"Q Did you, on January 10, 1970, almost two years before this case, stab Angela Cortese at 107-40 132nd Street?

"MR. GAUDELLI: Objection; asked and answered.

"THE COURT: No; overruled.

"A No.

"Q Would it help you to remember if I told you that you told the police that you had done that?

"A No.

"Q Did you on January 16, 1970, only six days later, stab Sheila Plaks in her neck at 139-18 48th Drive? Did you do that?

"A No.

"Q If I told you that you told the police that you did that—

"A No.

"Q — would you remember it then?

"A No.

"Q Did you on February 6, 1971, at 101-51 118th Street shoot Margie Sailer with a pellet gun, in the face?

"A No.

"Q If I told you that you told that to the police, would that help you remember that you did it?

"A No.

"Q Did you on June 3, 1971, at 107-41 120th Street shoot Marie Fraga with pellets in her face?

"A No.

"Q If I told you that you also told that to the police, would that help you remember?

"A No."

At this point the prosecutor's objection to the line of ques-

tioning was overruled on the ground that the defendant was entitled to leeway because of the insanity defense and because psychiatrists were to be called to testify as to these "admissions" by the defendant. The interrogation was resumed with counsel asking his client whether he had wounded Rose Conway with a knife in her apartment on June 9, 1971; shot Joan Meinick in the chest on June 16, 1971; hacked Fusako Watanado across her face and hands on July 26, 1971; stabbed Christine Mroz in the throat and hit her in the head with a cement block on August 23, 1971; stabbed and killed Camile Perniola on March 19, 1972; stabbed Clara Torriello four times in her neck and chest killing her on April 13, 1972; stabbed Elena Farnandez in the throat on June 13, 1972; stabbed Wilma Jung in her bed on June 15, 1972; and, finally, stabbed Deborah Januszko in her chest and killed her on June 17, 1972. In each case, the question included the address of the crime and was followed by a further inquiry as to whether it would assist the defendant in remembering if counsel told him that defendant had either stated that he committed the crime or had re-enacted it. Each inquiry received a negative response from the defendant.

The total number of persons mentioned in this direct examination as murdered or maimed was 14.

At the end of Baldi's testimony, defense counsel told the court (out of the jury's presence) that he intended to testify as a witness himself both because his other witnesses, Dr. Harry A. La Burt and Detective Lamardo, were not available, and on account of his concern that the jury might have been prejudiced by the prosecutor's challenge to him to testify to his client's behavior on certain occasions. Despite the court's statement that time was not a factor, defense counsel assumed the stand and described what had occurred at the July 7, 1972 meeting at the District Attorney's office. There is no indication in the record that the defendant consented to this testimony.

The attorney commenced by recounting the details of his initial meeting with Baldi, including the latter's lack of response—except for grunts—to efforts to make conversation. After relating the arrangement he had made with the District Attorney "to seek to ascertain whether the defendant, Baldi, had been involved in any of the homicides which were being investigated in the area in which he had been arrested," the witness embarked upon a lengthy and graphic description of

what had taken place in a room at the prosecutor's office when the defendant was brought there and Detective Lamardo volunteered to put the defendant back in a "catatonic state." Lamardo showed the defendant a photograph of a young murder victim lying nude on her back wearing a yellow hair dryer hood on her head and made a lewd suggestion to him. The defendant's reaction was to enter a trance-like state, his body sagging and his eyes becoming glassy. After touching an upper portion of the girl's anatomy in the picture, the defendant began licking his lips and mumbling, making apparent reference to her breasts. He walked to a window and explained that he saw a woman wearing a yellow dress and a brassiere whose hair he could not see because it was covered with a yellow object. Placing an imaginary object, which he said was a chair, below the window, he stepped up to the sill, raised the blind and secured it with the same type of knot which had secured the window shade in the girl's bedroom. The defendant then removed an imaginary knife from his pocket, pretended to cut the brassiere from the girl's body, made caressing motions and suddenly—as the lawyer described it—he lashed out with the knife, making four stabbing gestures and grunting, following which he attempted to climb into the girl's room where he again drew the knife. At this point, the defendant apparently cut the apparel away from the lower portion of the girl's body, made some other gestures, closed the knife and put it away. The defendant then rummaged through the drawers of two file cabinets ("dressers"), found an imaginary pocketbook and removed from it what he said was some money. When Detective Lamardo showed the defendant pictures of other murdered girls, he proceeded to re-enact more attacks while in an apparently trance-like state. Defense counsel declared that his client's performance lasted five hours. Counsel's description of it covers 25 pages of record.

After this testimony, the defense called Dr. La Burt, a psychiatrist, who informed the court that he had been present in the courtroom during counsel's testimony and that the defendant was a schizophrenic mental retardee with elements of dual personality superimposed. The witness concluded that on the day of the alleged attempted murder the defendant was a schizophrenic undifferentiated type and would not have the substantial capacity to know and appreciate the nature and quality of his acts. In order to provide a basis for an opinion

question concerning a possible remission in the defendant's mental state, defense counsel recounted the numerous other crimes about which he had asked the defendant. La Burt's response to the question was that if those were the facts it would indicate a "regression" in defendant.

In response to La Burt's testimony, the prosecution produced another psychiatrist, Dr. Daniel Schwartz, who asserted that the defendant did not lack the substantial capacity to know or appreciate either the nature and quality of his acts or their wrongfulness. According to Schwartz, Baldi was not suffering from schizophrenia, but rather from an "adjustment reaction" to the shock of having been arrested. He further stated that the "withdrawal" exhibited by the defendant was a selective, partially voluntary one, which would be overcome within a relatively short span of time. Schwartz revealed that his diagnosis differed from that of two doctors on his staff.

During his summation, defense counsel briefly reviewed the evidence supportive of his client's denials concerning the acts charged in the indictment. Then, he added: "Well, of course the defendant, and you heard at the outset, is under no obligation to put in a defense as to the charges, but he took the witness stand and he told you his version of that morning. I don't take either side or vouch for his position either way. You will have to decide what the facts were of that morning."

Counsel then added, "for whatever value you see in it," that no fingerprints had been lifted from the gun introduced into evidence as belonging to defendant, that no notation of the incident appeared in the police officers' memorandum books and that the officers had not mentioned any conversation as having taken place in the police car after the defendant's arrest.

The remainder of the summation dealt with the insanity defense. Regarding the criminal behavior attributed to defendant, counsel remarked:

"[COUNSEL]: There was testimony about action on the part of this defendant at times other than [the date of the charged attempted murder]. You have a right to consider them.

"MR. GAUDELLI: Objection.

"THE COURT: The only way they could be considered would be on the question of credibility. That's all.

"[COUNSEL]: I take exception to that, sir. I am about to

suggest to them that they have a right to consider these acts on the question of his mental condition.

"MR. GAUDELLI: Withdrawn.

"THE COURT: All right."

Referring to his own testimony, counsel said:

"Do you remember [I] testified on the witness stand objectively concerning that which was seen and heard by [me] on July 7th, 1972 in the District Attorney's office? * * *

"We learned that this defendant has said that he did kill people. We learned that this defendant said that he stabbed other people who did not die. We learned that this defendant said that he shot people, that he hacked somebody across the face and hands, that he stabbed someone in the throat, that he hit somebody in the head with a cement block, that at least four times he killed and yet the defendant, when told that he said these things, after he had been asked, 'Did you do it?' said 'No' * * * but, unfortunately, he did it to someone else without knowing it".

In its charge, the court declared that other crimes committed by the defendant which the jury had heard about could be considered solely on the question of his credibility but not to establish criminal bent. Despite the colloquys which had occurred during the trial, the instructions relative to the insanity defense contained no reference to these other crimes. Nevertheless, upon completion of the charge, defense counsel stated that he had no exceptions or further requests to make.

The jury convicted the defendant of attempted murder, burglary in the second degree, and possession of weapons. On November 25, 1974 the defendant was sentenced to concurrent terms of 8⅓ to 25 years, 0 to 10 years, and 0 to 5 years, respectively.

### III

Defendant's bench trial for the Januszko murder followed shortly. At a *Huntley* hearing conducted by a Justice other than the one who was to try the case, defense counsel challenged the admissibility of statements made on the night of his arrest on June 21, 1972 and the further statements made on July 7 and 14. Counsel asserted that none of the statements were voluntary because his client was not competent when he made them and that his client had been produced on July 7 and 14 on the basis of an agreement with the District

Attorney that anything said or done by the defendant at the meetings would not serve as the basis for criminal charges.

To support their position at the hearing, the People produced Detective Lamardo who testified to the June 21 and July 7 re-enactments and the July 14 statements. During his testimony, the relevant tape recordings were admitted into evidence by offer of the District Attorney joined by defense counsel and played in open court.

The People then called Dr. Schwartz, who testified that it was his opinion, based on his knowledge of the circumstances of the case and personal examination, that the defendant's statements and re-enactments while in a trance-like state were voluntary. He further testified that on July 14, 1972, when he examined the defendant while in a state of trance, there was no evidence of psychosis or mental illness that would have prevented him from understanding and appreciating what he was doing.

In cross-examining Schwartz, defense counsel sought to establish that the defendant was suffering from some type of mental imbalance, denominated as either schizophrenia or hysterical personality. Counsel explained to the court that his questioning was designed to prove that the defendant, when he went into a trance, "was no longer the same person who had gone into it" and that the defendant no longer had voluntary control over his thinking.

Nevertheless, despite the fact that only a short time before the *Huntley* hearing—at the attempted murder trial—Dr. La Burt had testified that any statements made by Baldi at the District Attorney's office were suspect because he was not in full possession of his faculties, the defense offered no expert testimony at the *Huntley* hearing to refute Schwartz' conclusions or to establish that the confessions at the precinct house or elsewhere were not knowingly made. Instead, defense counsel took the stand and posited that from his knowledge of Baldi up to July 7 he believed that the man had not made a conscious or intelligent statement to the detectives at the time of his arrest. Defense counsel declared that he believed, as did the Assistant District Attorney in charge of the homicide bureau, that if the defendant could be induced to enter a trance-like state again what transpired might assist in solving numerous homicides which were similar to the one re-enacted at the station house on June 21. Therefore, he and the Assistant District Attorney had agreed that the defendant was

so insane that he would never be tried and that they would attempt to have him committed to a mental institution for the rest of his life.

On cross-examination, defense counsel responded to a question concerning his consent to Baldi's July 7 production as follows: "A. I did not even look at the applications to the Court. I did look at—when Mr. Nicolosi brought it to me in the corridor of this building on July 5th—this single paragraph consent, wherein I signed a consent to an order of the Supreme Court to bring Baldi on Friday, July 7th, for the purpose of cooperating with the District Attorney's office in connection with pending investigations. That was the only paper I saw. It set forth what I was willing to do after my agreement with Mr. Nicolosi and I signed it."

Later in the course of cross-examination the following colloquy occurred:

"THE COURT: At that time you represented the defendant in only one matter; is that right?

"[COUNSEL]: That was the only one I knew of, the Januszko case, in which he had allegedly spoken to Detective Lamardo. * * *

"THE COURT: The other matters, the other three—there was no discussion—you were not representing him, rather, at the time?

"[COUNSEL]: No, no. They first came into being after the July 7th incident.

"THE COURT: You were not appointed by the Court or retained by the defendant?

"[COUNSEL]: No, sir.

"THE COURT: At most we could say you were acting as a friend of the court?

"[COUNSEL]: That's right, and by agreement with the D.A.

"THE COURT: Or were you there to prevent anything being said by this defendant involving him—

"[COUNSEL]: No, and that wasn't it. * * *

"THE COURT: Did you—did you ever speak to this defendant and inform him of the nature of the interrogation that was contemplated?

"[COUNSEL]: No; we did not know what was contemplated except that we anticipated he might be put into a trance. * * *

"THE COURT: [Counsel], at that time did you not know that the District Attorney's Office and the Homicide Bureau—the detectives were trying to resolve the deaths of three women where they believed the defendant may have been involved?

"[COUNSEL]: Yes."

In a colloquy at the end of the hearing, the court made it clear that the sole issue for determination was the factual one concerning the prosecutor's alleged agreement to refrain from using the defendant's admissions if he was produced for interrogation. The claim that defendant's statements were involuntary because of his incompetence to make them quite obviously was rejected for lack of proof:

"THE COURT: * * * [N]ever mind about the hypnotic state; never mind about the claim of insanity because a competent doctor testified as to the sanity of the defendant. * * *

"THE COURT [in response to the prosecutor's argument]: And that the insanity issue is not before the Court, the Court will agree with you".

In a written decision which followed, the *Huntley* court again relied upon the psychiatric testimony adduced by the People that the defendant knew and understood what he was doing and was not mentally ill while interrogated in a trance. Although the court concluded that "the statements and admissions were voluntarily made, and the defendant was competent at the time they were made," it resorted to other constitutional criteria to suppress the re-enactments and statements about the additional three murders. The *Huntley* court carefully avoided making any determination as to whether the prosecutor actually had made the alleged promise not to prosecute. After reviewing the totally contradictory contentions relative to the existence of such a promise, the court declared:

"It is the opinion of this Court, with respect to indictment numbers [those referring to the three other murders], that the defendant's attorney *relied upon his understanding* of the arrangement made with the Assistant District Attorney and allowed his client to be subjected to interrogation. The attorney, an expert in criminal matters, did not consult with the defendant as to the risks involved in this procedure as he was convinced of the defendant's insanity.

"Under the circumstances it would be a breach and violation of defendant's constitutional rights and privileges to

permit these statements and admissions in evidence. The Court grants the motion to suppress as to the statements and admissions made by the defendant in connection with [the] indictments [relating to the three other murders]." (Emphasis supplied.)

Thus, while the invasion of defendant's constitutional right to remain silent resulted in suppression of the statements concerning three of the four murders, his statements about the Januszko murder were not suppressed at all.

The formal trial of the Januszko case began with a description of the events of the morning of June 17, 1972 by the deceased's mother and the testimony of neighbors and policemen who saw a metal mailbox in the Januszko alleyway beneath the opened window after the murder. Detective Lamardo detailed the unsuppressed re-enactments at the precinct house, and a tape recording of one of those re-enactments was introduced in evidence.

After the prosecution rested, the defendant again took the stand in his own behalf and recounted his four-year commitment to Creedmoor State Hospital from 1962 to 1966. As to the crime itself, he denied that he killed Deborah Januszko, re-enacted her murder, or recognized the voice on the tape recording. On redirect examination, his attorney asked, *inter alia,* the following questions:

"Q Do you remember me telling you that you had gone through a lot of actions, motions, did things showing that you entered buildings, stabbed girls? Remember me telling you about that?

"A Yes. * * *

"Q Now, there were several times when I discussed with you and told you that you had either relived or reenacted, as I put it to you, some of these killings while you were in what I called a trance-like state? Do you remember me telling you about that?

"A Yes. * * *

"Q Do you recall having a conversation with me on more than one occasion in which I spoke to you about the fact that you had in these trance-like states, as I put it to you, indicated that you killed somebody even in 1971 by stabbing? You remember me telling you that?

"A Yes.

"Q And that was even before you were sent away to Mid-Hudson from Kings County; do you recall that?

"A Yes.

"Q Well, did you at any time while you were up in Mid-Hudson or when you came down from Mid-Hudson to Creedmoor—did you at that time while in custody say anything to anybody about having killed somebody before that?

"A No.

"Q Did you know that you had killed somebody?

"A No."

When Baldi had finished, defense counsel took the stand, but on this occasion, the court inquired as to whether he had discussed with his client what he was about to do. After answering in the affirmative, the attorney proceeded to describe the events of the July 7 meeting, telling the court that the defendant went into a trance when he saw a picture of a naked woman and that he had re-enacted "stabbings of different girls in different areas". On being cross-examined, the defense counsel declared that his client "had shown us instances of at least three or four killings that he had done by stabbing on different times."

 The defense then called Dr. La Burt who testified that the defendant suffered from an hysterical personality of the dissociative type and that under extreme pressure such a person experiences a personality change and becomes in effect someone else. According to Dr. La Burt, Baldi's intense concentration on the female breast might trigger such a personality change. The witness concluded that on the day of the alleged murder the defendant was in a dissociative state and would not have the substantial capacity to know and appreciate the nature and quality of his acts.

In rebuttal of La Burt's testimony, the prosecution called Dr. Schwartz, who asserted that while it was clear the defendant was suffering from a mental illness, he did not suffer from the personality disorder associated with classic hysterical neurosis. According to Schwartz, Baldi had shown some tendencies to retreat into another personality under times of great stress, but the retreat was voluntary as opposed to involuntary retreat of an hysterical neurotic. To support this hypothesis, the witness explained that the defendant had the ability to move back and forth at will from a normal to abnormal state, and that such a condition is not characteristic of a true

dual personality. Moreover, while in the abnormal state the defendant was never truly reliving past events but merely remembering them. Schwartz believed that Baldi did not lack substantial capacity to know or appreciate either the nature and quality of his acts or their wrongfulness. On this cross-examination, however, it was revealed not only that he had contradicted the diagnosis of other members of his staff, but that he had himself once diagnosed the defendant as "probably hysterical personality dissociative type".

The trial court found that the People had sustained their burden of establishing beyond a reasonable doubt that the defendant was sane at the time of the crime and that the defendant was guilty of the murder of Deborah Januszko (see *People v Baldi,* 80 Misc 2d 118). His sentence, imposed on January 16, 1975, was 25 years to life imprisonment.

## IV

Baldi's attack upon his convictions commences with a challenge to the triers' conclusions as to his sanity. Whether the defendant knew it was wrong to commit the acts for which he was charged was a question for the respective triers of fact who had the right to accept or reject the opinion of either psychiatrist *(People v Wood,* 12 NY2d 69; *People v Sherwood,* 271 NY 427; *People v Whitted,* 67 AD2d 736; *People v Buthy,* 38 AD2d 10). Both in *People v Wood (supra,* at p 77) and in *People v Horton* (308 NY 1, 12), the Court of Appeals declared that: "if the record in its entirety presents a fair conflict in the evidence, or if conflicting inferences can properly be drawn from it, '* * * the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption.' *(People v. Taylor,* 138 N. Y. 398, 405.)"

■ Nothing in either trial warrants departure from this general rule. It is true that the antithetical considerations presented to the triers of fact could have led to verdicts in either direction, but there was sufficient evidence to reject the insanity defense if the triers believed Dr. Schwartz' theory that Baldi's apparent retreats into another personality were voluntary. Accordingly, the triers' verdicts as to both guilt and sanity have factual support in the record. Were we not reversing on constitutional considerations, both verdicts would stand.

## V

We turn, then, to defendant's plaint that he was deprived of his constitutional right to effective assistance of counsel. The initial assertion in this respect is that counsel's assumption of a witness role constituted a per se deprivation of assistance of counsel. The issue is scarcely novel since the per se rule had its apparent origin in 1846,[2] but over the years the question of trial lawyer testimony has evolved from an exclusionary rule of evidence to a matter of ethical conduct. The Canons of Professional Ethics adopted by the American Bar Association in 1908 contained canon 19 to the effect that a lawyer who served a client both as advocate and witness acted with professional impropriety. Canon 19 remained unaltered until the promulgation of the ABA's Code of Professional Responsibility in 1969, adopted with some modification by the New York State Bar Association. Disciplinary Rule 5-102(A) of the code provides that if the "lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR 5-101 (B) (1) through (4)" (See *North Shore Neurosurgical Group v Leivy,* 72 AD2d 598; *Gasoline Expwy v Sun Oil Co. of Pa.,* 64 AD2d 647; *Tru-Bite Labs v Ashman,* 54 AD2d 345). Ethical Consideration 5-9 of the code states that "the roles of an advocate and of a witness are inconsistent".

The code's ethical strictures do not have the status of decisional or statutory law *(Matter of Weinstock,* 40 NY2d 1, 6; see *People v La Carruba,* 46 NY2d 658), however, nor do they constitute rules of evidence. Indeed, according to Informal Opinion No. 339 (Nov. 16, 1974) of the Committee on Professional Ethics of the ABA, DR 5-101(B) and 5-102(A) are not per se rules which require a literal reading, and their application necessarily depends "upon the attending facts" in each case.

The cases cited by the defendant (see *People v Kennedy,* 22 NY2d 280; *People v Rozzell,* 20 NY2d 712; *People v McGrath,* 31 AD2d 944) involved defendants seeking to withdraw guilty

---

2. That year a British nisi prius court granted a new trial on the ground that the lawyer's testimony had been improperly received in evidence (see *Stones v Byron,* 4 Dowl & L 393); it was shortly repudiated by a court sitting *en banc* (see *Cobbett v Hudson,* 1 E & B 11 [QB, 1852]).

pleas because their defense lawyers were required by the court to assume positions antagonistic to their clients. In each case, reversal was compelled not by the per se assumption of the witness role but by the content of the testimony which pitted the attorney against his client.

■ The weight of authority here and elsewhere establishes that a lawyer trying a case is not incompetent to testify during it and the admission of his testimony is not reversible error per se (see, e.g., *People v Tait,* 234 App Div 433, affd 259 NY 599; *Hughes v Sullivan Co.,* 261 App Div 39; *Renault, Inc. v Auto Imports,* 39 Misc 2d 25, affd 19 AD2d 814; *Wolk v Wolk,* 70 Misc 2d 620; *United States v Fiorillo,* 376 F2d 180; *United States v Buckhanon,* 505 F2d 1079; *Lau Ah Yew v Dulles,* 257 F2d 744; *State v Blake,* 157 Con 99; *Commonwealth v Rondeau,* — Mass —, 392 NE2d 1001; *State v Sullivan,* 60 Wn 2d 214; Defense Attorney As Witness For His Client in State Criminal Case, Ann. 52 ALR3d 887; Fisch, New York Evidence [2d ed], § 307; 2 Wharton's Criminal Evidence [13th ed], § 364). Thus, instant counsel did not per se deprive his client of the effective assistance of counsel when he ascended to the witness chair.

## VI

The crux of the ineffective assistance issue is whether defense counsel's conduct of his client's defenses so transgressed constitutional standards for effective representation as to compel reversal of one or both convictions. The traditional rule, of course, is whether the attorney's performance, or lack of it, rendered the trial a " 'farce and a mockery of justice' " *(People v Bennett,* 29 NY2d 462, 467; *People v Tomaselli,* 7 NY2d 350; *People v Brown,* 7 NY2d 359, cert den 365 US 821). The farce and mockery standard, with its genesis in the Federal system (see *United States v Wight,* 176 F2d 376, cert den 338 US 950; *Diggs v Welch,* 148 F2d 667, cert den 325 US 889)[3] is derived from the due process clause of the Fifth and Fourteenth Amendments and tests the fundamental fairness of the trial as a whole (see *Diggs v Welch, supra; Gideon v Wainwright,* 372 US 335, overruling *Betts v Brady,* 316 US

---

**3.** *United States v Wight* (176 F2d 376, 379) contains what appears to be the classic statement: "The proof of the efficiency of such assistance lies in the character of the resultant proceedings, and unless the purported representation by counsel was such as to make the trial a farce and a mockery of justice, mere allegations of incompetency or inefficiency of counsel will not ordinarily suffice".

455; *Cooper v Fitzharris,* 586 F2d 1325, 1328, cert den 440 US 974; *Marzullo v State of Maryland,* 561 F2d 540, 542, cert den 435 US 1011; *People v Pope,* 23 Cal 3d 412, 422). At its origin as a constitutional issue, assistance of counsel required an effective appointment (see *Powell v Alabama,* 287 US 45, 71) rather than an effective defense (see, e.g., *Reece v Georgia,* 350 US 85; *Glasser v United States,* 315 US 60). Subsequent analysis, however, transformed the focus to evaluation of the fairness of the trial as a whole as it appeared from the record and whether the trial and the conviction were rendered a farce and a mockery of justice by the performance of counsel (see, e.g., *Cooper v Fitzharris, supra,* pp 1328-1329; *People v Pope, supra,* p 423; see, generally, Tague, The Attempt to Improve Criminal Defense Representation, 15 Am Crim L Rev 109, 113-115).

The due process standard is an inherently subjective one since it can only be applied on a case-by-case weighing of the cumulative effect of a variety of prejudicial circumstances on the totality of the trial. Then, depending upon the visceral balance of the particular Judges, the appellate determination may be tipped in favor of reversal on mockery of justice grounds (see, e.g., *United States ex rel. Marcelin v Mancusi,* 462 F2d 36, cert den 410 US 917, where both majority and dissenter agreed on the mockery standard but arrived at contradictory conclusions; see, generally, Note, Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review, 13 Col JL & Soc Prob 1, 32-37). As stated by the Sixth Circuit in *Beasley v United States* (491 F2d 687, 692): "The phrase 'farce and mockery' has no obvious intrinsic meaning. What may appear a 'farce' to one court may seem a humdrum proceeding to another. The meaning of the Sixth Amendment does not, of course, vary with the sensibilities and subjective judgments of various courts. The law demands objective explanation, so as to ensure the even dispensation of justice."

## VII

The emergent rule—"reasonable competence"—had its apparent origin in 1970 in a dictum in *McMann v Richardson* (397 US 759, 771), where the United States Supreme Court noted that the initial inquiry as to the competence of counsel's advice to plead guilty should focus upon whether it was "within the range of competence demanded of attorneys in

criminal cases.["4] *McMann* was perceived as a rejection of the farce and mockery standard because it shifted the emphasis to the defendant's rights under the Sixth Amendment where the assistance—and therefore the performance—of counsel is the criterion. The analysis was thus extended beyond the fundamental fairness of the trial as a whole and the issue was converted to the conduct of counsel at all relevant phases of the criminal process, whether at trial or at pre- or posttrial proceedings (see *Cooper v Fitzharris,* 586 F2d, at p 1329; *People v Pope,* 23 Cal 3d, at p 423; see, also, Note, Ineffective Representation, 13 Col JL & Soc Prob 1, 41-45). Under the Sixth Amendment, "[o]ne may receive ineffective assistance of counsel even though the proceedings have not been a farce or mockery" *(Herring v Estelle,* 491 F2d 125, 128, reh den 493 F2d 664).

The reasonable competence standard has been said to demand the reasonably competent assistance of an attorney acting as a diligent conscientious advocate,[5] counsel who is likely to render and does render reasonably effective assistance[6] or whose performance is within the range of competence demanded of attorneys in criminal cases.[7]

Despite disavowal by the ABA of any intent to dictate criteria for the effective assistance of counsel (see ABA Project on Standards for Criminal Justice, Standards Relating to the

---

**4.** The court observed (p 771) that the matter of effective assistance in felony cases: "should be left to the good sense and discretion of the trial courts with the admonition that if the right to counsel guaranteed by the Constitution is to serve its purpose, defendants cannot be left to the mercies of incompetent counsel, and that judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts."

**5.** See, e.g., *Cooper v Fitzharris,* 586 F2d 1325, 1330, cert den 440 US 974; *United States v De Coster,* 487 F2d 1197, 1202, referred to as *De Coster* I, after remand No. 72-1283 [DC Cir, Oct. 19, 1976]; 624 F2d 196, referred to as *Decoster* III, cert den 444 US 944; *People v Pope,* 23 Cal 3d 412, 427.

**6.** See, e.g., *Beasley v United States,* 491 F2d 687, 696; *Herring v Estelle,* 491 F2d 125, 127, reh den 493 F2d 664.

**7.** See, e.g., *Cooper v Fitzharris,* 586 F2d 1325, 1330, cert den 440 US 974; *United States v Bosch,* 584 F2d 1113; *Marzullo v State of Maryland,* 561 F2d 540, 544; *United States v Easter,* 539 F2d 663, 666; *United States ex rel. Johnson v Johnson,* 531 F2d 169, 174, cert den 425 US 997; *Moore v United States,* 432 F2d 730, 736; *State v Clark,* 170 Conn 273, 283, cert den 425 US 962; *Zacek v Brewer,* 241 NW2d 41, 50-51 [Iowa]; *People v Garcia,* 398 Mich 250; *White v State,* 248 NW2d 281, 285 [Minn]; *State v Nokes,* 192 Neb 844, 850-851; *Heath v Vitek,* 115 NH 200, 201; *State ex rel. Wine v Bordenkircher,* 230 SE2d 747, 750 [W Va]; *Risher v State,* 523 P2d 421, 424 [Alaska].

Prosecution Function and the Defense Function [Approved Draft, 1971], § 1.1, subd [f], p 154), the ABA Standards have been drawn upon by various courts seeking to create more specific guidelines.[8] In a number of other jurisdictions the standards have, at least, warranted discussion in the course of the decisional process.[9] And, in *De Coster* III, reliance upon a categorical list was one of the issues which divided the court.[10]

In any event, since *McMann v Richardson (supra),* farce and mockery has been abandoned by 9 of the 11 Federal appeals circuits,[11] as well as numerous States[12] and the District of Columbia.[13]

---

**8.** See *DeCoster* I, *supra; State v Tucker,* 97 Idaho 4; *State v Harper,* 57 Wis 2d 543; *State v Hester,* 45 Ohio St 2d 71; *Baxter v Rose,* 523 SW2d 930 [Tenn].

In *People v Pope* (23 Cal 3d 412, 424-425), the California Supreme Court relied on the ABA Standards in setting forth the following "basic duties" of defense counsel under the Constitution:

(1) Counsel must diligently and actively participate in the full and effective preparation of the case;

(2) Counsel has a duty to investigate carefully all defenses of fact and law that may be available to the defendant;

(3) Counsel must confer with his client without undue delay and as often as necessary to elicit matters pertinent to his defense;

(4) Counsel should promptly advise his client of his rights and take all actions necessary to preserve them; and

(5) Counsel should be concerned with the accused's right to be released from custody pending trial and be prepared when appropriate to make motions for pretrial psychiatric examination for the suppression of evidence.

**9.** See, also, *Thomas v Wyrick,* 535 F2d 407, 413, n 6, cert den 429 US 868 [adequate preparation]; *United States ex rel. Robinson v Housewright,* 525 F2d 988, 993 [conflict of interest]; *McQueen v Swenson,* 498 F2d 207, 216-217 [duty to investigate]; *Steward v People,* 179 Col 31, 34 [control of litigation]; *State v Simmons,* 57 Wis 2d 285, 298 [challenge to the effectiveness of counsel].

**10.** See *United States v De Coster,* No. 72-1283 [DC Cir, July 10, 1979], cert den 444 US 944. An excellent discussion of the standards and the controversy over their use is contained in Justice WILLIAM ERICKSON's article, Standards of Competency for Defense Counsel in a Criminal Case, 17 Am Crim L Rev 233.

**11.** See *United States v De Coster* I, *supra; United States v Bosch,* 584 F2d 1113; *Moore v United States,* 432 F2d 730; *Marzullo v State of Maryland,* 561 F2d 540, cert den 435 US 1011; *Herring v Estelle,* 491 F2d 125, reh den 493 F2d 664; *Beasley v United States,* 491 F2d 687; *United States ex rel. Williams v Twomey,* 510 F2d 634, cert den *sub nom. Sielaff v Williams,* 423 US 876; *United States v Easter,* 539 F2d 663; *Cooper v Fitzharris,* 586 F2d 1325, cert den 440 US 974.

**12.** *Alaska: Green v State,* 579 P2d 14; *California: People v Pope,* 23 Cal 3d 412; *Colorado: People v Shook,* 186 Col 339; *Connecticut: State v Clark,* 170 Conn 273, cert den 425 US 962; *Georgia: Tamplin v State,* 235 Ga 20, vacated in part 235 Ga 774; *Hawaii: State v Kahalewai,* 54 Hawaii 28; *Idaho: State v Tucker,* 97 Idaho 4; *Iowa: Cleesen v State,* 258 NW2d 330; *Massachusetts: Commonwealth v Saferian,* 366 Mass 89; *Michigan: People v Garcia,* 398 Mich 250; *Minnesota: White v State,* 309 Minn

## VIII

In this State it is apparent that the farce and mockery formulation has been supplanted by a more exacting—but undefined—test recently characterized in *People v Aiken* (45 NY2d 394, 398) as a "flexible framework." Retrospective analysis makes it apparent that the shift originated in *People v Bennett* (29 NY2d 462, 466, *supra)* decided two years after the *McMann* decision. In *Bennett,* scrutiny was no longer focused upon the preventive action of the trial court (see, e.g., *People v Tomaselli,* 7 NY2d 350, *supra;* see, also, *People v Lampkins,* 21 NY2d 138) but rather on defense counsel's failings in the general conduct of the defense. *Bennett* thus recognized that the ineffective assistance issue transcended the limits of the trial itself because the right to representation entitled a defendant "to have counsel 'conduct appropriate investigations, both factual and legal, to determine if matters of defense can be developed, and to allow himself time for reflection and preparation for trial' " *(People v Bennett,* at p 466, quoting *Coles v Peyton,* 389 F2d 224, 226, cert den 393 US 849; see, also, *People v La Bree,* 34 NY2d 257, 260).

*People v Droz* (39 NY2d 457, 462) was a clearer herald of change because the issue of ineffective assistance was decided by reliance upon recognizable reasonable competence criteria without resort to "farce and mockery" terminology: "[I]t is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and the facts relevant to the defense *(People v Bennett, supra)* and who is familiar with, and able to employ at trial basic principles of criminal law and procedure *(People v LaBree,* 34 NY2d 257; cf. *People v Jones,* 25 NY2d 637). Whether counsel has adequately performed these functions is necessarily a question of degree, in which cumulative errors particularly on basic points essential to the defense, are often found to be determinative (see, e.g., *People v Bennett, supra; People v LaBree, supra)."*

Finally, in *People v Aiken (supra,* p 398), the Court of

476; *Missouri: State v Lumsden,* 589 SW2d 226; *Nebraska: State v Mackey,* 200 Neb 549; *New Hampshire: State v West,* 117 NH 340; *Pennsylvania: Commonwealth v Bartlett,* 486 Pa 396; *Rhode Island: State v Desroches,* 110 RI 497; *Tennessee: Baxter v Rose,* 523 SW2d 930; *Vermont: Matter of Cronin,* 133 Vt 234; *Washington: State v Adams,* 91 Wn 2d 86; *West Virginia: Cannellas v McKenzie,* 236 SE2d 327; *Wisconsin: State v Harper,* 57 Wis 2d 543.

**13.** *District of Columbia: Farrell v United States,* 391 A2d 755.

Appeals proclaimed a lack of adherence to either competing standard: "In recent years * * * we have displayed a greater desire to avoid the confining strictures of a standard presumptively applicable to all cases. In *People v Droz* * * * for example, rather than measuring the quality of counsel's representation of the defendant in terms of the 'mockery of justice' standard, we concluded only that upon the facts of that case counsel's omissions and errors precluded us from finding that his representation of the defendant 'was adequate or effective in any meaningful sense of the words.'" (See, also, *People v Bell,* 48 NY2d 933; *People v Gonzalez,* 47 NY2d 606.)

*Aiken's* significance transcends its dicta, however, since the court applied both standards before concluding that counsel's performance was satisfactory. This double analysis makes it apparent that the State's turn to Sixth Amendment criteria in the measurement of ineffectiveness of counsel has not resulted in the extinction of Fifth Amendment factors. Lest *Aiken* be simply read to indicate a side-by-side existence of the two competing standards, however, the obvious must be noted— the more taxing reasonable competence criterion diminishes the importance of the traditional one.[14] Nevertheless, we are constrained to differ somewhat with the conclusion of our brethren in the Fourth Department that *Aiken* and *Droz* have sapped the remaining vitality from the mockery of justice standard (see *People v Wise,* 64 AD2d 272; see, also, *People v Smith,* 61 AD2d 91, 100 [CARDAMONE, J., dissenting]). While we are in accord that the traditional semantic characterization is obsolete, the Fifth Amendment right to a fair trial remains a significant factor in ineffective assistance anslysis.

An inherent feature of the "flexible framework" rule enunciated in *Aiken* is its patent rejection of the route taken by California and other jurisdictions[15] in adopting fixed lists of defense counsel duties. Although the Court of Appeals has in the past made references to the ABA Standards,[16] and in *People v Bell* (48 NY2d 933, *supra), People v Gonzalez* (47

---

14. In *People v Jackson* (74 AD2d 585), this court rejected a challenge based on a claim of ineffective assistance because the appellant failed to establish a lack of reasonable competence by his trial counsel.

15. See, e.g., *People v Pope, supra; United States v De Coster, supra.*

16. ABA Standard 4.1 (ABA Project on Standards for Criminal Justice, the Prosecution Function and the Defense Function [Approved Draft, 1971]), has been referred to as a guideline for counsel's duties during the investigatory stages of the criminal process (see *People v Droz,* 39 NY2d 457, 462, *supra; People v Bennett,* 29 NY2d 462, 466-467, *supra).*

NY2d 606, *supra),* and *People v Droz* (39 NY2d 457, *supra)* mentioned several responsibilities appropriate to any gamut of lawyer duties, the declaration that the court would avoid "the confining strictures of a standard presumptively applicable to all cases" *(People v Aiken,* 45 NY2d, at p 398) makes it unlikely that New York will indulge a categorical inventory of lawyer obligations in the near future. More importantly, perhaps, the avoidance of fixed standards implies that mere proof of breach of duty does not suffice to establish ineffectiveness of counsel.

## IX

Our review of the actual assistance rendered Baldi in connection with both sets of charges against him discloses a particular curiosity. At the *Huntley* hearing in the Januszko trial, defense counsel related his belief, formulated prior to the July 7 meeting at the District Attorney's office, that his client was so insane that he never would be tried. While it may be that counsel changed his mind in the interim, it remains remarkable that the fitness findings contained in the CPL 730.30 psychiatric reports were accepted on three separate occasions without challenge and hearings were waived.

At the defendant's first trial, defense counsel's prejudicial examination of his client constituted nothing less than testimony from the lectern that the defendant had admitted killing or maiming 14 women. In his formal testimony from the witness box, counsel proceeded to contradict his client's persistent denials of the commission of re-enactments of these charged and uncharged crimes and vividly described the man's simulation of various murders and burglaries. In his summation, counsel declared that he did not vouch for his client's version of the facts and again referred to the defendant's other criminal acts. Although an attorney should not vouch for his client's version of the facts (see Code of Professional Responsibility, DR 7-106[C] [4]), when the instant disclaimer and the contradiction of the client are joined, the consequence is akin to disavowal of the defendant's personal assertions of innocent behavior.

Furthermore, during defense counsel's description of his client's horrifying re-enactments, no one was available to object or cross-examine him on defendant's behalf. Such action by an attorney, who leaves his client alone at the counsel table, is given substantial weight in determinations that a

defendant was deprived of his constitutional right to counsel (see, e.g., *United States v Fiorillo,* 376 F2d 180, 185, *supra;* see, also, *Rice v Baron,* 456 F Supp 1361; *Freeman v Kuliecke & Soffa Inds.,* 449 F Supp 974). The long-established general rule concerning the prejudicial effect of evidence which raises the inference that a defendant is of a criminal disposition *(People v Vails,* 43 NY2d 364, 368; *People v Fiore,* 34 NY2d 81, 84; *People v Dales,* 309 NY 97, 101; *People v Molineux,* 168 NY 264) always has been concerned with prosecutorial efforts to adduce such proof. Here, the prosecutor refrained from any such effort, the defendant himself denied committing any of the crimes, but defense counsel placed the information before the jury.

We believe that the evidence of defendant's murderous disposition was highly damaging to his defense. In *People v Santarelli* (49 NY2d 241, 250), the Court of Appeals forcefully referred to the prejudicial potential involved in prosecution proof of criminal conduct where the defendant's sanity is in issue: "In deciding whether to admit evidence of prior criminal or immoral conduct in rebuttal to an insanity claim, the trial court must take special care to ensure not only that the evidence bears some articulable relation to the issue, but also that its probative value in fact warrants its admission despite the potential for prejudice. As we noted in *People v Allweiss* (48 NY2d 40, 47, *supra):* 'If the evidence is actually of slight value when compared to the possible prejudice to the accused, it should not be admitted, even though it might technically relate to some fact to be proven' (accord McCormick, Evidence, § 190). This observation is particularly apt in cases involving the insanity defense, where virtually every fact in the accused's life may in some sense be said to have a bearing upon the issue of his mental state. Indeed, in insanity cases such as this, the danger is particularly great that the jury will become confused by the mass of evidence presented and will decide to convict the defendant not because they find he was legally sane at the time of the act, but rather because they are convinced that he is a person of general criminal bent."

Here, Dr. La Burt's testimony at the first trial created no articulable relationship between the uncharged crimes and defendant's sanity. Indeed, the defendant's alleged admissions of these crimes were not even accepted at "face value" by La Burt, who asserted that he suspected their authenticity. If the statements were true, he declared, they represented a "regres-

sion." At the murder trial, La Burt made no reference at all to the crimes. The lawyer's revelations thus served primarily to establish his client's dreadfully murderous bent.

Finally, counsel's failure to object to the court's charge that the evidence of the uncharged crimes related solely to credibility is mystifying since it is totally inconsistent with the proposition that the proof was submitted in order to enhance the insanity defense. Patently, the court should have been requested to charge that the defendant's alleged admissions of other criminal conduct could be considered only on the question of his sanity at the time of the commission of the crimes charged in the indictment.[17]

■ Measuring defendant's representation at his first trial by the requisite "flexible framework" standard, the conclusion that he was deprived of the effective assistance of counsel is inescapable.

## X

Scrutiny of the legal assistance Baldi received in connection with the Januszko case must begin with consideration of his attorney's agreement that he be produced to help solve other crimes. As the lawyer subsequently acknowledged at the *Huntley* hearing, his role in bringing about the July 7 and 14 interrogations and his capacity at the sessions was as a "friend of the court."

The position of the lawyer as a guardian of the accused's right against self incrimination is so basic to modern criminal law jurisprudence (see, e.g., *Miranda v Arizona,* 384 US 436; *Escobedo v Illinois,* 378 US 478; *People v Garofolo,* 46 NY2d 592; *People v Grant,* 45 NY2d 366; *People v Singer,* 44 NY2d 241; *People v Hobson,* 39 NY2d 479; *People v Arthur,* 22 NY2d 325; *People v Donovan,* 13 NY2d 148) that it should hardly be necessary for us to observe that participation in an

---

17. Our dissenting brother, MARTUSCELLO, J., states, (p 314) that nothing in the court's charge precluded the jury from considering the prior criminal acts on the insanity issue. This overlooks the fact that the court directed that: "[Y]ou will limit yourselves to considering such evidence on the question of credibility only * * * The fact that he may have been guilty of such prior conduct does not necessarily mean that he is not to be believed at this time by you." Remarkably, these instructions would have been given had the evidence of the other crimes been introduced by the prosecution, rather than, as here, by the defense. Counsel's failure to request that the acts be considered on the issue of insanity—his avowed purpose for introducing the evidence in the first instance—remains incomprehensible in the face of the court's direct mandate that the evidence was to be deemed to relate only to credibility.

experiment designed solely to elicit incriminating evidence from a client casts a shadow on every subsequent step taken in purported defense of that client.[18] It resulted in a clear surrender of the defendant's constitutional privilege and it breached defense counsel's duties to take all necessary steps to preserve his client's rights (see *People v Pope,* 23 Cal 3d, at pp 424-425; see, generally, Erickson, Standards of Competency for Defense Counsel in a Criminal Case, 17 Am Crim L Rev 233, 245).[19]

Highly significant, and directly relevant to the ultimate determination of guilt, was counsel's inexplicable failure to produce a psychiatrist at the *Huntley* hearing. Manifestly, the People's case rested almost entirely on Baldi's confessions, and —just as clearly—his prime hope of escaping conviction depended on his ability to suppress them as involuntary based on his lack of competence to make them (see CPL 60.45, subd 1; *Blackburn v Alabama,* 361 US 199). Once suppression on the ground of incompetence failed, the defense of insanity— which had failed at the earlier trial—deteriorated to little more than a last line of defense in the face of overpowering inculpatory proof. Thus, defendant's chances for acquittal were utterly vitiated by the failure to adduce psychiatric testimony which would have tested the prosecution's ability to establish beyond a reasonable doubt that the defendant was competent during the trances in which he re-enacted the Januszko murder. Yet, defense counsel's efforts were so unavailing at the suppression hearing as to prompt the *Huntley* court to characterize the competence question as nonexistent.[20]

---

18. The controversy over the extent of a lawyer's obligations where he becomes aware that his client has committed uncharged crimes was fueled by an article by Dean Monroe Freedman (see Freedman, Where the Bodies are Buried: The Adversary System and the Obligation of Confidentiality, 10 Crim L Bull 979). See, also, *People v Belge,* 83 Misc 2d 186, affd 50 AD2d 1088, affd 41 NY2d 60; New York State Bar Association Ethics Opinion 479 (1978).

19. Although our dissenting brother, MARTUSCELLO, J., writes that defendant's July 7 and 14 admissions of three other murders were suppressed because the *Huntley* court believed defense counsel's contention that an agreement for nonuse existed with the District Attorney, it is plain from that court's written decision that the suppression was based on violation of defendant's constitutional rights and not on the court's belief that a promise had been made. Furthermore, constitutional rights or not and promise or not, the crucial statements and re-enactments concerning the Januszko murder were not suppressed at all.

20. We disagree with Justice MARTUSCELLO's reference to our treatment of this aspect of counsel's performance as "taken out of context." Counsel's performance at the *Huntley* hearing may have saved his client from the consequences of the waiver of his Fifth Amendment rights with reference to three murders allegedly admitted on

The crucial opportunity to suppress the Januszko confessions having evaporated, counsel proceeded to introduce at the trial evidence of the admissions of multiple killings which had been suppressed. The client was asked whether he remembered discussing with counsel the various killings and burglaries that he had re-enacted. When he responded by declaring that he remembered the discussions but denying that he had killed anyone, defense counsel took the witness stand and, in the course of his testimony, stated that his client had re-enacted four murders. The lack of any specific connection between these revelations and legal insanity or to Dr. La Burt's testimony at the murder trial already has been discussed.

## XI

In response to the defendant's claim of ineffective assistance of counsel, the People argue that counsel's performance constituted a daring tactic intended to bolster the insanity defense. At worst, argues the prosecution, the effort to demonstrate the defendant's insanity by proof of a murderous disposition was a mistake in strategy.

Obviously, "[t]he right to counsel was not intended to afford a defendant, aided by the wisdom of hindsight, to second guess matters of trial strategy employed by counsel" *(People v Aiken,* 45 NY2d 394, 399, *supra;* see, also, *People v De Mauro,* 48 NY2d 892; *People v De Renzzio,* 19 NY2d 45). And, of course, we recognize that the defense of a criminal prosecution involves a host of judgments, some strategic and some tactical, concerning the type of defense to pursue, the witnesses to call, the direct questions to be put, the extent of cross-examination if any, plus a myriad of other determinations which frequently have a decisive impact on the outcome of the trial (see, generally, ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, [Approved Draft, 1971], § 5.2, and comments). A disappointed defendant may have difficulty in discerning between a daring but unsuccessful defense and lawyer ineptitude: "If [counsel] decides to flail around and raise a considerable amount of dust, with the inevitable risk that

---

July 7 and 14, but it made a nonissue out of his client's opportunity to suppress the only real evidence of guilt the People possessed relative to the Januszko murder—his own inculpatory statements and re-enactments.

some may settle on his client, the defendant will blame him if the tactic fails, although in the rare event of success the client will rank him with leaders of the bar who have used such methods in some celebrated trials of the past" *(United States v Katz,* 425 F2d 928, 930).

Under farce and mockery analysis, erroneous trial strategy is the basis for reversal on ineffective assistance grounds only where the strategy is so devoid of reason or shows such a lack of familiarity with basic legal principles so as to be the sole or at least a contributing factor in the conclusion that the trial was a mockery of justice.[21] The reversal standard has been cast in terms of whether counsel's actions withdrew a crucial defense from the case,[22] or whether there has been a deliberate abdication, by conscious conduct, of the lawyer's ethical duty to fairly represent his client.[23] The New York decisions support the proposition that trial strategy will be scrutinized only where it was a factor in the conclusion that the defendant's trial was a mockery of justice (see *People v Lampkins,* 21 NY2d 138, *supra; People v Brown,* 7 NY2d 359, 361, *supra).*

In reasonable competency jurisdictions, the question is what a reasonably competent lawyer would have done under the circumstances. In *Beasley v United States* (491 F2d 687, *supra)* where counsel called as the sole defense witness an extremely hostile FBI agent, the trial court characterized the ploy as a "bizarre defense strategy" to prove that a skilled criminal such as the defendant would not have undertaken so amateurish a robbery as the one charged. Holding that the defendant had been denied the effective assistance of counsel, the court wrote (p 696): "Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effectice assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial * * * If, however, action that appears erroneous from hindsight was taken for reasons that would appear

---

21. See, e.g., *United States ex rel. Walker v Henderson,* 492 F2d 1311, cert den 417 US 972; *Opie v Meacham,* 419 F2d 465, cert den 399 US 927; *Michaud v Robbins,* 263 F Supp 535, affd 424 F2d 971; *State v Jones,* 110 Ariz 546, cert den 419 US 1004; see, also, ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function [Approved Draft, 1971] § 5.2, p 240).

22. See, e.g., *People v Mattson,* 51 Cal 2d 777; *Bruce v United States,* 379 F2d 113; *Glass v United States,* 395 A2d 796 [DC App].

23. See, e.g., *Brown v Swenson,* 487 F2d 1236, cert den 416 US 944; *Robinson v United States,* 448 F2d 1255 [CCA 8th, 1971].

sound to a competent criminal attorney, the assistance of counsel had not been constitutionally defective."

In California, effective assistance of counsel will be deemed denied where the lawyer has made "a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases. This is true even if the decision was not made from ignorance of the law or a fact." (See *People v Pope*, 23 Cal 3d 412, 424, *supra; accord State v Adams*, 91 Wn 2d 86; *People v Garcia*, 398 Mich 250; *State ex rel. Wine v Bordenkircher*, 230 SE2d 747 [W Va]; *Hussick v State*, 19 Ore App 915; *State v Anonymous*, 34 Conn Sup 656.) Adopting the *Beasley* standard, the Supreme Judicial Court of Massachusetts has stated: "Although most cases involving a claim of ineffective counsel concern counsel's lack of preparation, there may be instances where the judgment of fully informed counsel may be manifestly unreasonable as to be unprotected by the labels of 'trial strategy' or 'trial tactics.' " *(Commonwealth v Adams,* — Mass —, —, 375 NE2d 681, 685; see, also, *Commonwealth v Williams,* — Mass —, 391 NE2d 1202.)

Here, the prosecution possessed strong evidence that the defendant had committed the principal acts charged— eyewitnesses in the first case and re-enactments in the other.[24] Absent the prejudicial embellishment provided by proof which tended to establish that the defendant was a vicious killer, the sanity issue was a close one. Dr. Schwartz was alone in his belief that the defendant was able to comprehend the nature and consequence of his acts at the time of the crimes and even Schwartz had previously diagnosed the defendant as being a chronic schizophrenic of an undifferentiated type. In our view, the gross reliance upon the proposition that the defendant's chances of acquittal would be improved by emphasizing to the trier of fact the defendant's morbid background and disposition to murder and mutilate when on the street (see *People v Duke,* 58 AD2d 31) and the omission of any real effort to suppress the defendant's confessions are difficult to accept as trial strategy.[25] As it relates to the first trial, the entire

---

24. Despite statements in Justice MARTUSCELLO's dissent, the murder charge against Baldi rested almost entirely on his own admissions. The knives referred to in the dissent were never offered in evidence and it is difficult to see how they could have been tied to the murder in question.

25. We are aware that in *People v Garrow* (51 AD2d 814), where the defendant made a claim of ineffective assistance of counsel after testifying to two uncharged murders to support his insanity defense, the Third Department observed that "the strategy of putting defendant on the stand might be questioned by some [but], we

contention seems premised on the hypothesis that the jury might be more willing to acquit the defendant of attempted murder on the ground of insanity if they were shown that he murdered and maimed 14 other persons. As to the murder trial, we discern no special strategy—only a defense of insanity supplemented by proof of murderous bent.

In any event, when there is added to the recited litany of ineffective performance the yielding up of defendant's Fifth Amendment privilege against self incrimination, it becomes impossible to conjure a rational foundation to support the concept that the assistance the defendant received comported with constitutional standards. Plainly, it did not.

## XII

Finally, there is the matter of harmless error analysis. In *Chapman v California* (386 US 18, 24, reh den 386 US 987), the Supreme Court fashioned the rule that errors of a constitutional dimension may be deemed harmless where it can be shown beyond a reasonable doubt that the error "did not contribute to the verdict obtained" (see, also, *Fahy v Connecticut*, 375 US 85, 86; see, generally, Ineffective Assistance of Counsel and the Harmless Error Rule: The Eighth Circuit Abandons Chapman, 43 Geo Wash L Rev 1384).

In *People v Crimmins* (36 NY2d 230, 237), the Court of Appeals adhered to the *Chapman-Fahy* harmless error rule declaring that errors of constitutional magnitude can be considered nonprejudicial only where proof of guilt is overwhelming and where "there is no reasonable possibility that the

---

cannot say that it was unreasonable to expect that he would buttress his defense of insanity by his testimony as to his past crimes and bizarre behavior." Ultimately, *Garrow* differs significantly from the instant case. Once the Third Department rejected Garrow's contention that the advice that he testify as to the uncharged crimes was improperly motivated, the ineffectiveness issue was determined under farce and mockery criteria and was confined to the boundaries of the trial itself. Since there was strong independent evidence against Garrow by three survivors of the abduction and killing involved, it is apparent that the Third Department believed that the gamble involved in admitting uncharged crimes did not render the trial farcical. In the Januszko case, it is impossible to discern an acceptable strategy in the failure to attempt suppression of confessions on insanity grounds and the subsequent reliance on insanity as a defense to the crime charged after the confessions were before the trier. In the attempted murder case, the defendant never admitted the crimes and the ones his lawyer posited were so numerous and heinous as to eliminate any reasonable possibility that the insanity claim would be sufficiently enhanced to overcome the palpable prejudice involved in making the jury aware that the defendant's street potential was so terrifying.

error might have contributed to defendant's conviction and that it was thus harmless beyond a reasonable doubt" (see, also, *People v Almestica,* 42 NY2d 222).

The *Chapman* court noted that there are some constitutional rights—the right to counsel being one—so fundamental to ⸫ fair trial that they may never be treated as harmless (386 US, at pp 23-24, n 8). Indeed, in *People v Felder* (47 NY2d 287), the Court of Appeals declined to consider the matter of harmless error where the defendants had been represented by an individual never licensed as an attorney. Although the right to the assistance of counsel continues to be a focus of current jurisprudence (see, e.g., *Cuyler v Sullivan,* 446 US 335; *Holloway v Arkansas,* 435 US 475, 489; *Geders v United States,* 425 US 80; *Herring v New York,* 422 US 853), the issue here is a broader one encompassing the quality of the assistance rendered and whether any deficiency in such quality compromised constitutional standards to the degree that reversal is required.

We begin this portion of our analysis by noting that, under certain circumstances, resort to harmless error analysis may be precluded. According to the Court of Appeals, "[I]f in any instance, an appellate court concludes that there has been *such* error of a trial court, *such* misconduct of a prosecutor, *such* inadequacy of defense counsel, or such other wrong as to have operated to deny any individual defendant his fundamental right to a fair trial, the reviewing court must reverse the conviction and grant a new trial, quite without regard to any evaluation as to whether the errors contributed to the defendant's conviction." *(People v Crimmins,* 36 NY2d, at p 238; emphasis supplied.)

The type of flagrant error, misconduct or inadequacy referred to in the quoted language has been illustrated in reversals where the conduct involved precluded a fair trial (see, e.g., *People v De Jesus,* 42 NY2d 519 [misconduct by court]; *People v Alicea,* 37 NY2d 601 [prosecutorial misconduct]; *People v Savvides,* 1 NY2d 554 [prosecutorial misconduct]; see, also, *People v Williams,* 46 NY2d 1070; cf. *People v Cook,* 42 NY2d 204, 209 [COOKE, J., dissenting]). We do not believe that the *Crimmins* dictum was intended to establish a per se rule for claims of ineffective assistance of counsel. Indeed, in *People v La Bree* (34 NY2d 257, *supra),* shortly before *Crimmins,* the Court of Appeals engaged in harmless error analysis before reversing the conviction on grounds of

inadequate assistance of counsel. In our view, the *Crimmins* dictum refers to such a total ineptness of counsel as would result in total destruction of the fairness of the trial and thus relieve the defendant of the necessity to show precisely how he was affected.

■ No examination of the relationship between the harmless error doctrine and ineffective assistance of counsel can be meaningful without analysis of the components of ineffective assistance itself. In *United States v De Coster* III (Dist Ct, DC, July 10, 1979, the late Judge LEVENTHAL, writing for the *en banc* court plurality, outlined the two basic principles involved in establishing ineffective assistance of counsel: (1) "the claimed inadequacy must be a serious incompetency that falls measurably below the performance expected of fallible lawyers"; and (2) "the accused must bear the initial burden of demonstrating a likelihood that counsel's inadequacy affected the outcome of the trial" (see, also, Erickson, Standards of Competency for Defense Counsel in a Criminal Case, 17 Am Crim L Rev 233). Thus, the conclusion that a defendant was deprived of the effective assistance of counsel necessarily embraces not only a serious incompetency, inefficiency or inattentiveness of counsel *(Commonwealth v Saferian,* 366 Mass 89, 96), but also a determination of likelihood of damage to the defendant as well (see, e.g., *Cooper v Fitzharris,* 586 F2d 1325, 1331-1333, *supra; United States ex rel. Green v Rundle,* 434 F2d 1112, 1114; *Cheely v United States,* 535 F2d 934; *United States v Pinkney,* 543 F2d 908; *United States v Ingram,* 477 F2d 236, 240; *United States v Easter,* 539 F2d 663, 666; *United States v Moore,* 554 F2d 1086, 1089; see, also, *Chambers v Maroney,* 399 US 42, 53-54; contra *Beasley v United States,* 491 F2d 687, 696-697, *supra).* We are in accord with the view that in evaluating claims of ineffective assistance of counsel mere proof of breach of duty will not suffice to establish a constitutional violation.

■ Since we recognize prejudice as a requisite ingredient of proof of ineffective assistance, we also note that the People's burden in harmless error analysis is a heavy one. It is in the face of a defendant's demonstration that counsel's performance probably prejudiced his case that the burden shifts to the prosecution to prove beyond a reasonable doubt that the error was harmless.[26]

---

26. Whether a distinction exists between prejudice at a bench trial as compared to a jury trial is not directly material in the instant case because of our conclusion that

■ ■ Applying this methodology both to the Januszko case and the earlier trial, the defendant clearly has shown that his lawyer's performances were seriously deficient and that his defenses were prejudiced by them, but the People have been unable to bear their burden of establishing beyond a reasonable doubt that the outcome of the trials was not affected by the manner in which the defenses were conducted. Thus, the assistance Baldi received in each case was ineffective within the meaning of the Constitution and harmless error analysis fails to salvage either conviction.

The judgments must be reversed and the defendant given new trials. The unfortunate circumstances detailed here compel us to reiterate to bench, bar and law enforcement authorities alike that, no matter what the apparent degree of defendant's depravity or the likelihood of his guilt, the right to the constitutional shelter of effective assistance of counsel and a fair trial are to remain inviolate.

Accordingly, both judgments of conviction should be reversed and the matters remanded for new trials.

---

the ineffectiveness of counsel in the defense of the murder charge commenced almost from the time of assignment. Nevertheless, it is worthwhile to observe that the Court of Appeals has recognized that a Judge's contact with material that a jury would not have been permitted to hear or see is not necessarily fatal to a bench trial (see *People v Brown,* 24 NY2d 168), although prior to *Brown* the First Department (see *People v Horie,* 258 App Div 246) and the Third Department (see *People v Kozer,* 33 AD2d 617; *People v Guernsey,* 24 AD2d 811) disagreed sharply as to the ultimate prejudice involved in the receipt of illegal evidence at a bench trial. The presumption that a Judge as a trier of facts is not prejudiced by improper evidence seems to have been adopted by this department (see *People v Lombardi,* 76 AD2d 891 [decided herewith]), and by numerous Federal and State appellate tribunals (see, e.g., *United States v Reeves,* 348 F2d 469; *Teate v United States,* 297 F2d 120; *United States v McCarthy,* 470 F2d 222; *Schenck v State,* 128 Ga App 270; *People v Harris,* 57 Ill 2d 228; *State v Gordon,* 219 Kan 643; *Matter of Appeal No. 977 from Circuit Ct. of Baltimore City,* 22 Md App 511; *People v Payne,* 37 Mich App 442; *State v White,* 15 Ohio St 2d 146; *State v Cafarelli,* 254 Ore 73).

In some jurisdictions, however, the presumption is limited to situations where there has been a refusal to admit the questionable evidence (see, e.g., *People v Mascarenas,* 181 Col 268), where there has been an initial admission and a subsequent disclaimer of reliance (see, e.g., *United States v Dillon,* 436 F2d 1093; *Webb v State,* 253 Ark 448; *People v Talley,* 65 Cal 2d 830; *State v Gleason,* 359 A2d 308 [Me]; *Matter of Appeal No. 977 from Circuit Court of Baltimore City,* 22 Md App 511; *Rodriquez v State,* 509 SW2d 319 [Tex]; *Galbraith v State,* 503 P2d 1192 [Wyo]), or where the improper material has been subsequently excluded (see, e.g., *United States v Miles,* 401 F2d 65; *United States v Weldon,* 384 F2d 772; *Oates v United States,* 233 F 201, cert den 242 US 633; *Commonwealth v Wright,* 234 Pa Super 83; *State v Bruns,* 522 SW2d 54 [Mo]). But even in the jurisdictions where no curative device need support the presumption, if reliance on the improper matter can be shown, reversal is mandated.

MARTUSCELLO, J. (dissenting). I dissent and vote to affirm both judgments of conviction.

During the early morning hours of September 5, 1971 defendant opened a window of the bottom floor apartment of Anne Heeseman located at 88-59 Elderts Lane in Queens, reached in and took Heeseman's pocketbook which had been on her dining room table. Later that morning, at 5:00 A.M., Police Officer John Hamberger, responding to a report of a prowler in the Elderts Lane area, stopped the defendant, who, after some questioning, pulled out a gun and attempted to shoot Officer Hamberger in the chest. Officer Hamberger and his partner arrested defendant and found in his possession property belonging to Heeseman.

After a hearing and pursuant to an order dated October 14, 1971, defendant was found to lack the capacity to understand the proceedings against him or to assist in his own defense. In an indictment filed December 23, 1971 defendant was charged, *inter alia,* with attempted murder and burglary in the second degree.

During this time defendant remained confined in various mental institutions. However, in February, 1972, defendant was mistakenly released and he returned home.

Subsequently, on June 17, 1972, defendant stabbed and killed Deborah Januszko in her home. At 5:00 A.M. on June 20, 1972 Detective Donald Palmer approached defendant on 170th Street in Queens and told him that the police were conducting a canvass in the area relative to the Januszko homicide. At midnight of the next day Detective Palmer returned to see defendant at his home.[1] Defendant then admitted that he had attempted to shoot Officer Hamberger. Thereupon he was brought to the station house where he was questioned by Detective Lamardo. At said questioning on June 21, 1972, and on two subsequent occasions, namely, July 7 and 14, 1972, defendant re-enacted the Januszko homicide. On the latter two dates he not only re-enacted the Januszko homicide but three others as well. The July 7 and 14 re-enactments occurred in sessions held with the consent of his attorney. As a result of defendant's admissions, four indictments were returned against him.

An arraignment on the various charges pending against

---

1. The police returned because they could not satisfactorily verify defendant's claim, made on June 20, that he was attending a trade school.

defendant was held on April 10, 1973. A finding of competency was accepted and a hearing on that issue waived. Defendant entered pleas of not guilty and not guilty by reason of insanity. By notices of motion dated April 10, 1973 defense counsel moved to have a chromosome scan and evaluation performed on the defendant. By notices of motion dated May 7, 1973 defendant made omnibus motions, *inter alia,* seeking transcription and discovery of Grand Jury minutes, discovery and inspection of statements made by the defendant and any reports by experts. A suppression hearing was also requested.

While the record is unclear as to what occurred next, on October 18, 1974 the court received a report that the defendant was capable of standing trial. Defense counsel accepted this report. On October 21, 1974 trial commenced on the attempted murder and burglary charges stemming from the September 5, 1971 occurrence.

### THE FIRST TRIAL

At the commencement of the trial, held before a jury, defense counsel at a sidebar conference told the Trial Judge the following: "It is the defendant's position, and he wants this known for the record, that he believes that any act which has a bearing on his mental condition is part of that which should be brought to the attention of the jury, so that when a psychiatrist testifies concerning his opinion as to the man's mental capacity, there is a foundation upon which to predicate it."[2]

Defense counsel delivered an opening in which he detailed defendant's prior confinement in mental institutions and the fact that defendant re-enacted four homicides of young women.

The trial continued and the People presented evidence which left little doubt of defendant's complicity in the attempted murder and burglary. The defense then began its case with its first witness being the defendant.

Defendant testified that he had been committed to the Creedmoor State Hospital from 1962 to 1966. In regard to the morning of September 5, 1971, defendant denied that he had burglarized Heeseman's house. He explained the fact that he was in possession of property obviously belonging to her by

---

2. Unfortunately the majority has ignored this statement. They, therefore, fail to realize that much of what they find fault with was done with defendant's consent, and perhaps even at his request.

asserting that he had found it in the street. As to the charge that he had attempted to shoot Officer Hamberger, defendant conceded that he had a .22 caliber starting pistol in his back pocket at the time of arrest but he denied firing it, or even pointing it at Officer Hamberger. Defendant contended further that the gun introduced in evidence was not his. Upon further questioning defendant denied remembering the events which occurred on June 20, 1972 and June 21, 1972.

The following discussions then occurred between the court, the prosecutor and defense counsel:

"MR. GAUDELLI [the prosecutor]: I press my objection. It is obvious counsel is now testifying to facts that are not in evidence. It's obvious defendant isn't going to remember anything about what happened that day. In effect, [counsel] is now testifying. I submit to the Court, if he wants to testify, he should take the stand; because I believe he was there that day.

"[COUNSEL]: No, I wasn't; but I'll be glad to testify."

Counsel continued his examination of the defendant asking him if he shot five named people. The defendant stated that he had not. Defendant also stated that it would not help his recollection if he was told that he had stated on a prior occasion that he had committed those crimes.

Significantly, the prosecutor objected to this line of questioning, stating the following at a sidebar conference:

"I submit to the Court by allowing counsel to go into all these suspected crimes in the same area when there isn't sufficient evidence * * * to indict is improper and prejudicial to the People's case.[3]

"[COUNSEL]: If I may respond, I'd like to say this, sir: Officer Lamardo had indicated to me, and I intend to put him on the stand to so testify, that the defendant has acknowledged to him having done these various things as part of a history of what the man is like, what his activity has been. I'm questioning him whether he did, in fact, do them and remembers that he did them, because this is part of a bizarre history of the

---

3. The majority, in concluding that counsel was incompetent, relies heavily on this portion of the record where defense counsel asked the defendant whether he committed 14 stabbings and shootings. Significantly, however, at the trial the prosecutor objected to this line of questioning on the ground that the People's case was being prejudiced.

individual, and I only have two or three more and then I'm coming to the actual murders that he detailed."

Defense counsel continued the same line of questioning asking the defendant whether he committed nine different violent stabbings and shootings. In each case, upon defendant's denial of involvement, his attorney asked him if it would help him remember if told that he had previously admitted his guilt. In each case the defendant responded that it would not.

The defendant concluded his testimony. The following then occurred at a sidebar conference requested by defense counsel:

"[COUNSEL]: * * * I also want to indicate another problem I am contending with now, so this record will reflect some of defense counsel's thinking on the matter.

"Yesterday, at one point during my questioning of defendant, the District Attorney commented that '[counsel] was there. If he wants to testify, why doesn't he take the stand.' The fact of the matter is I was present during what I regard as bizarre behavior, and I could very well testify to what I saw, without professing to be a medical doctor or a psychiatrist. I am somewhat loath to do that because I realize it is not the usual procedure of counsel. Yet, in the absence of Lomardo [sic] and the light of the comment by the District Attorney, which may very well have some effect upon the jurors' thinking about why, if I saw it, I do not tell about what I saw. I am very much inclined to possibly detail what I did see. I was wondering whether, perhaps, this might be an appropriate time then to take a luncheon recess, let me evaluate further whether LaBurt will be here and whether I will proceed without him by testifying myself. I also want to indicate to both Mr. Gaudelli and the Court that if I do testify, I will—if I do testify, I will endeavor to be completely objective and just detail what I visually saw and heard, without seeking to characterize or enact because I am aware of the fact that to me it was a very dramatic thing, and I might have the temptation to, but I recognize my position as an officer of the court.

"MR. GAUDELLI: I think you could conduct yourself properly. I think we have faith in your objectivity."

Ultimately, counsel, who had been admitted to the New York Bar in 1936, testified that at meetings with defendant on July 7 and 14, 1972, defendant re-enacted various murders while in a trance-like state.

Following defense counsel's testimony the defense psychiatrist, Dr. Harry La Burt, took the stand. He testified that defendant did not have substantial capacity to appreciate the nature or consequence of his act. Testimony was also elicited from Dr. La Burt regarding his view of someone who had re-enacted murders as described in the testimony of defense counsel.

To counter this testimony Dr. Schwartz testified for the People that on September 5, 1971 the defendant had the mental capacity to know and appreciate the nature and wrongfulness of his conduct; that he was not suffering from any mental disease or defect; and that he was not a schizophrenic.

On *cross-examination by defense counsel,* Dr. Schwartz conceded that he had not seen defendant personally during September or October, 1971 and that his staff members who had, diagnosed defendant as suffering from a schizophrenic reaction, chronic undifferentiated.

Both sides rested and counsel moved for a directed verdict of not guilty by reason of insanity. The motion was denied.

Counsel thereupon delivered a summation in which he stated the following: "Well, of course the defendant, and you heard at the outset, is under no obligation to put in a defense as to the charges, but he took the witness stand and he told you his version of that morning. I don't take either side or vouch for his position either way. You will have to decide what the facts were of that morning. I am going to speak about what he told you now from another aspect, the aspect of his defense of insanity, and whether or not the person that you saw sitting on that witness stand the other day, who sits here in this courtroom today did do it or whether the man who got up on that stand and said the things to you that he did only shows by his testimony how sick he is."

Counsel then argued as follows in support of the defendant's claim that he did not commit the crimes:

"I direct your attention, for whatever value you see in it, to certain aspects of my cross examination and the testimony elicited from the two police officers. You have a gun. It has flat surfaces on it. It has solid surfaces on it. If you look, you will be able to see there still is, as a matter of fact, the fingerprints that I impressed on it with my thumb at that time when I showed it to the witness on the witness stand, and since the testimony of the police officers was to be, and

since their allegation is, that this man had his gun and he allegedly said right off the bat that he didn't have a gun, how easy would it have been, in the light of our current scientific knowledge, to take the fingerprints. Certainly, this defendant handled it one time or another and opened it to put cartridges in. Wouldn't he have somewheres on it, on one of these flat surfaces, fingerprints that would tie him completely to this weapon? Even this holster, if you want to close this holster, you must necessarily put your finger on the button and press, and if you do that and then you look at it, there is what is known as a latent fingerprint.

"But, they're not here. And talking about some of the things that the defendant is alleged to have said to the police on that morning of September the 5, 1971, it seems a little strange that no where in the officer's memorandum book and no where in any record that he made at any time except within his mind, as he testified here on the stand, three years later. No where is there any reference to any of these conversations that he allegedly had with the defendant, and it also seems strange to me if, in fact, the police had taken the gun from this man on that morning, after he alleged to have pointed it point blank at someone and pulled the trigger, wouldn't there have been some conversation with him in the police car, 'What the hell are you trying to do, pointing a gun at me, trying to kill me,' something of that sort. Wouldn't there be some talk about it? But neither officer, at any time, said anything about there having been such a conversation. That is as far as I'm going on the question of telling you he had no part of it, that he is not guilty of these three specific counts that you are going to have to decide."

Counsel next proceeded to discuss the aspect of the defense dealing with insanity. He stated the following:

"Our position is: Here is a person who has been sick just about all his life * * * There was testimony about action on the part of this defendant at times other than September 5, 1971. You have a right to consider them.

"MR. GAUDELLI: Objection.

"THE COURT: The only way they could be considered would be on the question of credibility. That's all.

"[COUNSEL]: I take exception to that, sir. I am about to suggest to them that they have a right to consider these acts on the question of his mental condition.

"MR. GAUDELLI: Withdrawn.

"THE COURT: All right."

Defense counsel continued by discussing the evidence of defendant's insanity. In support of this claim he pointed to his own testimony which, in an obvious attempt to buttress its credibility, he termed objective.

The summations were completed and the jury charged. On the issue of credibility the Judge stated the following:

"When a defendant takes the stand he becomes a witness in his own behalf, his credibility, like any other witness, may be impeached by showing any criminal acts of his life occurring after he became sixteen years of age which may affect his character and tend to show that he is not worthy of belief. You will recall the testimony of the defendants [sic] as to acts committed while in Creedmore [sic] Hospital. That simply means that you may consider such facts, in arriving at a determination as to whether the defendant is presently telling the truth. The fact that he may have been guilty of such prior conduct does not necessarily mean that he is not to be believed at this time by you. It is for you to decide whether his testimony is worthy of belief.

"However, you will limit yourselves to considering such evidence on the question of credibility only. It is not received and it must not be considered by you as proving, indicating, or suggesting that because the defendant has at some time in the past been guilty of such conduct, he is a person who is disposed to do vicious things and, therefore, likely to have committed the crime of which he is accused in this case."

After the jury completed its deliberations it returned a verdict finding the defendant guilty of attempted murder, burglary in the second degree and possession of weapons, etc., as a felony.

THE SECOND TRIAL

Proceedings regarding the Januszko homicide as well as the other murders defendant re-enacted commenced on November 7, 1974 with a *Huntley* hearing.

Detective Lamardo testified for the People that on June 21, 1972 he gave the defendant his *Miranda* rights after which he interrogated him. Defendant then engaged in behavior which appeared to re-enact the Januszko homicide three times. Defendant was also returned to the scene of the crime where there was a further re-enactment of the murder. Lamardo

again met with the defendant on July 7 and 14, in the presence of his counsel. On each of those occasions defendant appeared to re-enact the Januszko homicide as well as three others. Lamardo further testified that there was no agreement not to use the evidence developed in this way against the defendant.

Dr. Schwartz testified for the People that, as to the July 14 interrogation, the defendant made his statements while in a self-induced trance and that statements made while in such a state would be voluntary.

The People rested and defense counsel took the stand. The court expressed the view that defense counsel would not be representing his client properly if he did not take the stand.

Counsel testified that he met with the defendant in Kings County Hospital on June 22, 1972. Defendant appeared to be in a stupor and essentially responded only with grunts. On July 5, 1972 he met with Lamardo and Assistant District Attorney Nicolisi who expressed the view that if defendant was placed in a trance-like state, he might be able to solve other cases. Also they each repeatedly indicated that they believed defendant to be so insane that he could not possibly be tried. Counsel and Nicolisi had a definite agreement that the July 7, 1972 interrogation would not be used against the defendant in connection with any prosecution.

On cross-examination defense counsel conceded that he believed that the confessions to the crimes and the manner in which they were given would facilitate a defense of not guilty by reason of insanity which was his only true legal defense. Counsel also explained that while he was acting as a friend of the court, it was in the context of an agreement that the defendant would not be prosecuted.[4]

After both sides rested on the *Huntley* hearing the People argued that defendant's statements on July 7 and 14, 1972 should not be suppressed because they were made in the presence of counsel. The court responded as follows: "THE COURT: Mr. Gaudelli, you evidently missed for three days what the Court's concerned with * * * never mind about the hypnotic state; never mind about the claim of insanity because a competent doctor testified as to the sanity of the defendant. But I have a lawyer, an experienced lawyer, that appears in

---

4. In view of the agreement not to prosecute it is apparent that counsel's representation should not be found ineffective because he acted as a friend of the court.

the office of the prosecution and he makes allegations in my court under oath under which he permitted his client to be interrogated and during the entire interrogation that went on for two days, never once stopped that man from testifying, which leads me to believe that this man had the right to rely on the word of your office [that there would be no prosecution]."

In a memorandum dated November 12, 1974, Criminal Term (AGRESTA, J.), held that defendant's statements about the Januszko homicide were voluntarily made and that the defendant was competent at the time they were made. Accordingly, it refused to suppress those statements. As to the defendant's admissions about the three other homicides made on July 7 and 14, the court suppressed them. After referring to defense counsel as an "expert in criminal matters" the court held that he had relied upon his understanding of the arrangement made with the People.

On November 26, 1974 the nonjury trial on the Januszko homicide began. Counsel presented an opening in which he declared that it was the defense position that defendant did not commit the crime and that in any event he was not guilty by reason of insanity.

The People's case rested on Lamardo's testimony of his June 21, 1972 interrogation of the defendant during which the Januszko homicide was re-enacted. Also, a tape recording of the June 21, 1972 session was introduced. Defendant's counsel in cross-examining Lamardo about the June 21 interrogation, sought to establish that the defendant was not competent at that time and that his statements were not voluntarily made.

The People rested and the defendant took the stand in his own behalf testifying about his prior institutionalization. He denied killing Januszko and stated that he did not remember doing the things Lamardo said he did when he was brought to the station house on June 21, 1972.

On cross-examination defendant showed sufficient understanding of the proceedings so as to refuse to answer a question about his conversations with a psychiatrist at Creedmoor on the ground that the question did not refer to his case.

After the defendant completed his testimony defense counsel took the stand. Counsel indicated that he had discussed with the defendant what he was going to do. He testified briefly and in a general way that on July 7, 1972 the defen-

dant with a "vacant stare" had re-enacted three or four homicides.

Following completion of counsel's testimony, Dr. La Burt testified for the defense and Dr. Schwartz for the People on the issue of defendant's sanity. Their testimony was similar to that presented at the first trial, except that Dr. Schwartz, under extensive cross-examination, conceded that he had at one point diagnosed defendant as "probably hysterical personality dissociative type" or multiple personality.

Both sides rested and defense counsel delivered a summation in which he contended that defendant's statements on June 21, 1972 were involuntary in that the defendant was not conscious of what he was doing. Counsel argued further that there was a lack of proof of defendant's commission of the Januszko homicide and that in any event there should be an acquittal by reason of insanity.

Criminal Term (BALBACH, J.), in a decision stated December 18, 1974 (People v Baldi, 80 Misc 2d 118), held that testimony regarding defendant's statements and actions on June 21, 1972 were admissible in evidence. The court, in discussing the re-enactments conducted by the defendant in his June 21 meeting with Lamardo, inter alia, stated (p 125):

"As regards the first interview in which the defendant acknowledged cutting a girl and making gestures relating to an imaginary box, this court finds these statements to be voluntary and, consequently, to possess high probative value. The facts seem to indicate that the defendant was aware of what he was saying and does not appear to have entered a trance at this point.

"As for the second interview, in which the defendant gave brief answers, and the third interview, in which the defendant gave taped answers, this court finds that the defendant was apparently in some form of trance for at least a portion of this time and concludes that the probative value of these statements and acts is minimal.

"The final interview, dealing with the visit to the site of the crime, appears to have considerable probative value. On this visit, the defendant appears to have been aware of what was transpiring. He spoke to the detective and even held on to his hand. Further, when the squad car reached the area, the defendant got out all alone and went to the victim's home and re-enacted scenes which indicate a guilty knowledge. The facts indicate that the defendant was, for some period, in a state of

trance during the later enactment, but it would appear that he enacted his acts through his own knowledge and was not susceptible to outside influences. Hence, under the trustworthiness test laid down in *People v Schompert* ([19 NY2d 300] *supra)* these admissions by acts would be reliable. Based upon the above reasons, this court concludes that the statements and actions of the defendant are admissible and have the probative value indicated."

As to the sanity issue the court found the People's evidence persuasive and, accordingly, defendant was found guilty of the murder of Januszko.

### THE MAJORITY'S CONTENTIONS

Stripped to its essentials the majority contends: (1) a new and more flexible standard for judging ineffectiveness of counsel has arisen under which the fact that an attorney acted as he did for strategic reasons is not determinative; (2) counsel should not have testified; (3) counsel in his testimony should not have contradicted defendant's denials of the commission or re-enactments of the various homicides; (4) counsel should not have examined defendant about the killing or maiming of 14 women; (5) counsel should have challenged the findings that defendant was competent to stand trial; (6) counsel should have objected to the court's jury charge that the evidence of the uncharged crimes may be considered only on the question of defendant's credibility; (7) counsel in his summation to the jury should not have adopted an objective stance by stating that he does not vouch for the defendant; (8) counsel should not have acquiesced to the July 7 and 14 interrogations of the defendant; and (9) counsel should have produced a psychiatrist to testify at the suppression hearing held in the Januszko case.

Close analysis of the first four of the above points shows that they are matters which relate to strategy, it being the majority's view that counsel should have realized that the affirmative actions taken on behalf of the defense would weaken rather than strengthen it. The remaining points raised are of a type traditionally raised by defendants who contend that their trial counsel was inadequate. These points involve actions which a defendant believes his attorney should have taken but failed to.

In my view the majority has engaged in a selective recital of the transcript in reaching its conclusions. Careful examination

of the record shows that the faults found in defense counsel's representation are unwarranted and that, in any event, the matters adverted to are not so serious as to constitute incompetence. Essentially the representation afforded the defendant is being found ineffective because a novel and daring, even if questionable, strategy was used in an attempt to establish the defense of insanity. The central fact remains that the defense of insanity was vigorously presented and that the strategy used to present it cannot be termed unreasonable. Moreover, there is an inherent lack of logic in the position adopted by the majority since it concedes that a close issue was presented at the trials on the issue of insanity. The question then presents itself as to how ineffective counsel was if he succeeded in making defendant's sanity a close issue.

I. THE STANDARDS FOR JUDGING INCOMPETENCE OF AN ATTORNEY AND COUNSEL'S DEFENSE STRATEGY.

It is the majority's contention that under current standards for judging competence of an attorney the representation rendered here must be deemed inadequate. The majority believes that counsel's testimony and his bringing to the court's attention other crimes with which defendant was involved irrevocably prejudiced the case against the defendant. I agree that the standard for judging incompetence of counsel is no longer simply whether the legal representation afforded a defendant rendered the trial a farce and mockery of justice.[5] While the majority expounds on the issue of what the standard is for judging incompetence of counsel, this court, in *People v Jackson* (74 AD2d 585), unmistakenly indicated that in determining adequacy of counsel the question is whether he has demonstrated reasonable competence in defense of his client.[6] In any event, where the incidents of alleged incompetence involve matters of strategy, reversal on the ground that a defendant was denied the effective assistance of counsel should be rare indeed.

An examination of the case at bar shows that the evidence available to and presented by the People overwhelmingly established defendant's guilt of the crimes with which he was charged. The only hope for defendant lay in verdicts of not

5. Although not controlling here, in *Indiviglio v United States* (612 F2d 624), the United States Court of Appeals for the Second Circuit reaffirmed its adherence to the farce and mockery standard.

6. See, also, the First Department's memorandum decision in *People v Sellars* (74 AD2d 551).

guilty by reason of insanity. Counsel, obviously aware of this, brought to the attention of the jury in the first trial and the Judge in the second the fact that defendant had been involved in numerous crimes other than those for which he was then on trial and that defendant had re-enacted some of these crimes in a bizarre manner. Clearly, counsel hoped that this testimony would buttress the expert psychiatric testimony of insanity that he was going to present. Moreover, the record supports the view that the defendant himself wanted the evidence of the other crimes to come out at the trials.[7] The situation faced, therefore, is one in which an attorney made a calculated tactical decision after consultation with his client. The decision certainly seems reasonable even if questionable since evidence that the defendant had killed frequently and that he had in a bizarre manner re-enacted some of these killings could strengthen the view that defendant was totally insane. Oddly enough the majority concedes that counsel created a close case on the issue of insanity. The impression therefore created is that the basis for finding incompetence lies in counsel's failure to win the case. In any event, even if there were errors in the representation afforded defendant, analysis of the leading cases on the issue support the view that since they were part of a reasonable strategy there should be an affirmance.

In *People v Brown* (7 NY2d 359, cert den 365 US 821), a case decided under the rule providing that legal representation was ineffective only if it rendered the trial a farce and mockery of justice, the court clearly stated that errors of judgment or of tactics by a defense attorney during trial would not provide a basis upon which to upset a conviction.

*McMann v Richardson* (397 US 759, 770), which the majority terms the origin of the rule of judging the effectiveness of an attorney by a standard of reasonable competence, in discussing whether an attorney properly advised his client to waive a trial states: "Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts." Significantly, the court indicated that a defendant assumes

---

**7.** At the first trial counsel told the court at a sidebar conference that the defendant wanted any acts reflecting on his mental condition brought to the jury's attention. At the second trial before counsel took the stand he conferred with the defendant.

the risk of ordinary error in either his or his attorney's assessment of the law and facts.

While in *People v Bennett* (29 NY2d 462) the court refused to define with precision what constitutes ineffective legal representation it did, nevertheless, find ineffectiveness in that the attorney had rendered the trial a farce and mockery of justice. There the sole possible defense was insanity. The court, in finding ineffectiveness, pointed to the total lack of preparation of defense counsel including such factors as counsel's inability to phrase a hypothetical question for the psychiatrist and placing psychiatrists on the stand who testified that defendant was sane.

In *People v Droz* (39 NY2d 457, 463) the court did not refer to the farce and mockery standard but instead, in reversing, stated that "we cannot say that the representation defendant received in this case was adequate or effective in any meaningful sense of the words." The court pointed to the following inadequacies of counsel (pp 462-463):

"Here it is evident that counsel made little or no effort to prepare the case for trial. He did not consult with his client until two months after his appointment, and then only on the first day of the initial trial. In addition, apart from mailing two letters, he made no attempt to contact potential witnesses to determine whether they might have any evidence helpful to the defense. Apparently he did not even study the record. Thus, he was not aware that the defendant had previously pleaded guilty to the charges alleged in the last three counts of the indictment, and consequently, very damaging testimony regarding the cache of drugs found in the defendant's apartment was admitted at trial, when it properly should have been excluded. And if counsel was familiar with the fact that defendant had also pleaded guilty, and later withdrawn the plea to the remaining counts, it is difficult to understand why he was so instrumental in bringing this highly prejudicial matter to the attention of the jury.

"This particular error was later compounded when counsel advised the defendant that a mistrial would accomplish nothing since the information regarding the withdrawn plea would come out on cross-examination, in any event, once he took the stand. That, of course, is not correct since it is well settled that a guilty plea, once withdrawn, 'is out of the case forever and for all purposes' *(People v Spitaleri,* 9 NY2d 168, 173). Finally we note that counsel made no effort to obtain the

prior testimony of Detective McGuckin, although use of such testimony on cross-examination is now accepted as one of the fundamental methods for 'impeaching the prosecutor's witness' *(People v Rosario* [9 NY2d 286], *supra,* at p 290; see, also, *People v LaBree,* [34 NY2d 257], *supra,* at p 259), particularly the primary witness for the prosecution."

Of great significance to the instant appeal is *People v Garrow* (51 AD2d 814). There defendant admitted at his trial that he had caused a death by stabbing. Defendant, in his testimony, also confessed to three other murders and numerous rapes. Defendant relied on a defense of insanity. On appeal he contended that he was denied the effective assistance of counsel. The Appellate Division, Third Department, in affirming the conviction stated: "[W]hile the strategy of putting defendant on the stand might be questioned by some, we cannot say that it was unreasonable to expect that he would buttress his defense of insanity by his testimony as to his past crimes and bizarre behavior."[8]

Any inquiry in this jurisdiction on the effectiveness of counsel must of course focus on *People v Aiken* (45 NY2d 394). In *Aiken* the defendant absented himself from the trial. Nevertheless, defense counsel's motion for a mistrial was denied. Defendant, *inter alia,* contended that he was denied the effective assistance of counsel because his attorney (1) waived an opening and closing statement and (2) failed to cross-examine witnesses called either by the People or the codefendant.

The court noted the mockery of justice and more stringent reasonable competence standards for judging effectiveness of legal representation. While it did not expressly adopt the latter standard, it did indicate that competence of counsel is to be judged by a more flexible standard than mockery of justice.[9] In any event defendant was found not to have been

---

**8.** The majority (p 289, n 25) seeks to distinguish *Garrow.* However, they misapprehend its significance which lies not in the criteria used to review effectiveness of counsel but in the statement that it is not unreasonable to expect that an insanity defense would be buttressed by testimony as to bizarre behavior. By way of comparison, see *People v Duke* (58 AD2d 31) where, in a case not involving an insanity defense, the Appellate Division, First Department, ordered a new trial on the ground of inadequacy of counsel, *inter alia,* because defense counsel brought to the jury's attention proof of prior sales of narcotics by the defendant on occasions other than those charged in the indictment. The distinguishing feature of course is that such evidence served no purpose for the defense. It merely showed that defendant was of a criminal bent deeply involved in the narcotics business.

**9.** The court stated the following (p 398): "Nonetheless, given the judicial need for

denied effective representation under either standard. The reasons for the conclusion that representation had been effective are of particular importance here. The court called the waiver of an opening and closing as well as the failure to cross-examine witnesses a matter of strategy. In this regard the following was stated (p 399): "[W]e emphasize that a defendant who absents himself from trial may not succeed on appeal by raising counsel's purported ineffectiveness where counsel affirmatively, as a matter of trial strategy, sought to obstruct the trial of his client. * * * Instead, we view counsel's conduct as indicative of a conscious strategic decision designed to pressure the trial court into declaring a mistrial. As such, *the wisdom of counsel's decision can provide no basis for appellant's claim that he was denied effective counsel.*" (Emphasis supplied.)

The overpowering effect of the fact that an attorney acted for strategic reasons on a claim that counsel was incompetent is again indicated in the more recent case of *People v Bell* (48 NY2d 933, 934-935), where the court found that there was no question that there was a lack of effective assistance of counsel, stating: "His retained attorney not only failed to request any pretrial hearings, conduct any *voir dire* of jurors or make any opening statement, but also asserted as a defense in this narcotics prosecution 'trafficking' without ever coherently indicating what the defense consisted of, by cross-examination of prosecution witnesses elicited incriminating hearsay evidence against his client, joined in a motion by codefendant Bell made at the end of the People's case for dismissal of the charges against Bell on the ground that his client, Pritchett, was the only one involved, but nevertheless sought to establish an agency defense, as to which he requested an instruc-

---

the application of some standard with which to gauge the representation provided by defense counsel, we have attempted in the past to formulate a threshold standard, and, in so doing, have held that although counsel's representation of a defendant need not be errorless *(People v La Bree,* 34 NY2d, at pp 260-261, *supra),* it must not be such as to render the defendant's 'trial a farce and a mockery of justice'. *(People v Brown,* 7 NY2d 359, 361, cert den 365 US 821; *People v Bennett,* 29 NY2d, at p 467, *supra; People v Tomaselli,* 7 NY2d 350, 354.) In recent years, however, we have displayed a greater desire to avoid the confining strictures of a standard presumptively applicable to all cases. In *People v Droz (supra),* for example, rather than measuring the quality of counsel's representation of the defendant in terms of the 'mockery of justice' standard, we concluded only that upon the facts of that case counsel's omissions and errors precluded us from finding that his representation of the defendant 'was adequate or effective in any meaningful sense of the words.' (39 NY2d, at p 463, *supra.)"*

tion to the jury, with Bell as the principal, put Pritchett on the stand and, apparently in relation to the trafficking defense elicited a confession from Pritchett as to his part in the selling of the drugs, made a largely irrelevant closing argument, and to cap it off made no sentencing statement on behalf of Pritchett at all. Such a litany establishes beyond peradventure that *what is here involved is not a misguided though reasonably plausible strategy decision but clear ineffectiveness of counsel; why else proffer an unrecognizable defense or join in a motion that only his own client was involved."* (Emphasis supplied.)

On the other hand, in *People v De Mauro* (48 NY2d 892) an attorney failed to make a pretrial motion to suppress five statements and delayed in requesting a mistrial after evidence of the defendant's unrelated incarceration had been introduced. In affirming the court, *inter alia,* stated (p 894): "These were no more than matters of trial tactics and errors of judgment at most."

Finally, we ourselves, in addressing the issue of incompetence of counsel, have recently pointed to the central effect of strategy. In *People v Jackson* (74 AD2d 585, *supra)* the defendant was charged with an armed robbery at a fast-food restaurant. Testimony presented at a *Wade* hearing indicated that shortly after the crime several of the restaurant's employees were shown an array of photographs. Defendant's photograph was not included in this array and the witnesses made no identification. Later, an anonymous tip was received at the restaurant implicating the defendant in the robbery. When this information was relayed to the police, a second photographic array was assembled which included defendant's photograph. Two of the employees then selected the defendant's photograph and, at the *Wade* hearing, identified him as a perpetrator of the crime. We described defense counsel's trial strategy and analyzed it as follows (p 586): "At the trial, counsel planned to offer an alibi defense. His witnesses, however, were vulnerable to impeachment either because of a close family relationship to the defendant or because of an unsavory personal background. Consequently, counsel did not rely solely on the alibi testimony but attempted to challenge the identification evidence offered by the People. He succeeded in demonstrating certain discrepancies between the description of the perpetrator initially given to the police and the actual appearance of the defendant. He then chose to press his

attack by exploring the photograph identification made by the prosecution's witnesses. He established that the first array, from which no selection was made, was comprised of 150 photographs, while the second, compiled after police attention had been drawn to the defendant, contained only six. Counsel's apparent purpose was to persuade the jury that the identification testimony at trial was not the product of the witnesses' independent recollection but of subtle police suggestion. In effect, counsel asked the jury to infer that the detectives had sought to solve the case by severely limiting the number of photographs in the second array and by then focusing the witnesses' attention upon the defendant, with whom the police were familiar and about whom they had received the anonymous tip. Counsel thereupon produced the individual who had provided the tip to testify that he had done so in anger following an altercation with the defendant. On the witness stand, he retracted the accusation and supported the defendant's alibi defense. As executed at trial, counsel's strategy was somewhat unorthodox and apparently unsuccessful. *Nevertheless, it is not the law that, with the benefit of hindsight, an attorney will be judged incompetent whenever he unsuccessfully employs an unusual or innovative approach at trial.* As long as counsel demonstrates reasonable competence, there can be no claim of ineffective assistance." (Emphasis supplied.)

After discussing *People v Bell* (48 NY2d 933, *supra)* and *People v De Mauro* (48 NY2d 892, *supra)* we concluded (p 587): "Both *De Mauro* and *Bell* are helpful here; the first because it recognizes that unsuccessful strategy decisions do not spell out ineffective assistance, and the second because it stands in such stark contrast to the record presently before us. In the case at bar, counsel duly requested a *Wade* hearing. He vigorously cross-examined the prosecution witnesses in accordance with his strategy and theory of the case. Demonstrating adequate investigation and preparation, he planned and competently presented a four-witness alibi defense * * * Lastly, he delivered a summation which, although no model of clarity, nonetheless brought home to the jury the essential position of the defense that the identification was suspect while the alibi was credible. Significantly, at no point did the defendant suggest that he was dissatisfied with the quality of representation his retained counsel was providing * * * In our view, then, the record in this case viewed as a whole demonstrates reasonably

plausible strategy decisions and trial tactics not amounting to ineffective assistance."

The pattern that emerges is that if the alleged ineffectiveness of counsel involves a matter of strategy reversal will not be warranted so long as the strategy is reasonably plausible. In my view the determination of counsel here to bring to the attention of the court through various means including his own testimony defendant's violent past and bizarre behavior cannot be deemed an unreasonable and implausible strategy. Its purpose was clear and the defense presented certainly was well prepared, vigorous and recognizable. At no point did defendant object to his counsel's tactics. It is of no small significance that the People objected, on the grounds of prejudice, to counsel's examination of defendant about the killing and maiming of 14 women.[10]

Regarding the fact that counsel took the stand himself, the majority correctly concedes that this does not by itself establish ineffectiveness of counsel. Certainly, where counsel's purpose is to testify in favor of the defendant and apparently with his consent in furtherance of the trial strategy there is no denial of the right to the effective assistance of counsel (cf. *United States v Hall*, 346 F2d 875, 882).

Accordingly, the affirmative steps taken by counsel, an experienced criminal defense attorney, in support of the defense of insanity do not support the majority's conclusion that defendant was denied the right to the effective assistance of counsel.

II. COUNSEL'S FAILURE TO CHALLENGE THE FINDING THAT DEFENDANT WAS COMPETENT TO STAND TRIAL

Under CPL article 730 a defendant who as a result of mental disease or defect lacks capacity at the time of trial to understand the proceedings against him or to assist in his defense is deemed incapacitated and unfit to proceed to trial. The Legislature, in enacting this provision, had in mind "the situation where the defendant, because of a current inability to comprehend * * * cannot with a modicum of intelligence assist counsel" *(People v Francabandera,* 33 NY2d 429, 435-436).

At the sentence proceeding held on November 25, 1974 in

---

10. Of course while there are limitations on the People in introducing proof of prior crimes (see *People v Santarelli,* 49 NY2d 241), such limitations certainly do not apply to a defendant seeking to prove insanity.

regard to the first trial, the following was stated by counsel and the court:

"[COUNSEL]: Strangely enough, as time has progressed and while this defendant has been in custody, it appears that his condition has vastly improved so much so that this man who, at the age of 33, had never learned to read or write has now, while in custody, developed both of those abilities * * * He actually has been given a degree of authority in that he counts the silverware for the warden * * *

"[THE COURT]: * * * I agree with what counsel has said, that there is obviously a change in the defendant from the first stage that I saw him. I suppose that that would be, in the words of the psychiatrist, a period of remission."

As to the trials themselves, defendant testified at both of them. He rationally and intelligently denied involvement in the crimes charged. At the second trial he showed sufficient alertness so as to refuse to answer a question on cross-examination on the ground that it did not refer to his case.

What is apparent beyond peradventure is that defendant was fit to proceed at both trials and that counsel knew that lack of fitness could not be established. Nevertheless, counsel's failure to contest defendant's competency to stand trial is adduced as evidence of counsel's incompetency. I pose the following question to the majority in response: Is an attorney's representation of a defendant to be deemed ineffective because the attorney refuses to take obviously useless steps in defense of his client?[11]

### III. COUNSEL'S SUMMATION AND THE CHARGE TO THE JURY

The majority is of the view that the defense summation is lacking because in it counsel declared that he did not "vouch for [defendant's] position." I have earlier set forth a large portion of the summation so as to indicate the innocuous nature of this comment. Examined in its context the record shows that immediately after this comment and notwithstanding the fact that counsel's position was that defendant was insane, counsel pointed to weaknesses in the People's proof of defendant's involvement in the crime. In view of the defense being presented by counsel, his ability to present a cogent argument in support of the defendant's position that he did not commit the crime (the lack of fingerprints and the lack of

---

11. "[D]efense counsel is not required to brief and argue every conceivable argument" (United States v Daniels, 558 F2d 122, 126).

a memorandum of defendant's statements) hardly presents a basis upon which his competence can be questioned.

In regard to the charge, the majority contends that counsel was remiss in not objecting to the instruction that the jury consider defendant's prior criminal behavior only as to his credibility. What the majority disregards is that this portion of the charge expressly related to defendant's testimony that he did not commit the crime (see the relevant portion of the charge, *supra,* p 300).[12] Not only was the charge not objectionable but it correctly reflected the law. The jury in determining whether or not to believe defendant's testimony that he did not commit the crime could properly consider the evidence of his prior criminal activity only for purposes of weighing his credibility and not as proof that he committed the subject crimes (see *People v Jones,* 71 AD2d 981; *People v Lo Primo,* 69 AD2d 890; *People v Peltak,* 54 AD2d 1051, revd on other grounds 45 NY2d 905).

Only later in the charge did the jury receive instruction on the insanity defense. On that defense the jury was instructed as follows: "But when there appears in a particular case any evidence tending to prove a mental infirmity and thus tending to overthrow the presumption of sanity, then the People are required to undertake the burden of going forward * * * The purpose of expert testimony is to aid you in your deliberation as to the particular subject concerning which expert testimony is admissible. But such testimony is merely a guide to you in your deliberation of the facts."

There is nothing within this instruction which prevented the jury from considering defendant's prior acts on the issue of his sanity.[13] Accordingly, there was nothing for counsel to object to and there was no need for him to request any additional instruction.

IV. DEFENSE COUNSEL'S CONSENT TO THE JULY 7 AND 14 INTERROGATIONS OF THE DEFENDANT.

Much is made of the fact that counsel turned the defendant over to the People on two occasions, July 7 and 14, during

---

12. The majority (p 285, n 17) asserts that the instructions given are those normally charged when the prosecution introduces evidence of other crimes. The fact remains that the instructions were favorable to the defendant's claim that he did not commit the crimes.

13. Counsel's summation, as set forth, *supra,* p 299, indicates that the prosecutor conceded in the jury's presence that it may consider defendant's prior acts on the question of his sanity.

which he in effect confessed to three homicides in addition to the Januszko one. The short answer to this is that Criminal Term (AGRESTA, J.) suppressed the confessions on the ground that there was an agreement between defense counsel and the People that there would be no prosecution for those crimes.[14] An attorney who makes an arrangement which frees his client from prosecution for three murders can hardly be termed ineffective.[15]

V. DEFENSE COUNSEL'S FAILURE TO PRESENT PSYCHIATRIC TESTI-MONY IN CONNECTION WITH THE HUNTLEY HEARING HELD FOR THE JANUSZKO HOMICIDE.

Counsel's conduct of the second trial is criticized because he failed to introduce psychiatric testimony to buttress the contention that defendant's statements made on June 21, 1972 to Detective Lamardo were involuntary on the ground of his incompetency and insanity. The point is also made that had these statements been suppressed there would be no case against the defendant.

It is of course true that mental illness will mandate suppression of a defendant's confession unless the People prove beyond a reasonable doubt that it was made as a result of a rational and meaningful act of volition *(Blackburn v Alabama,* 361 US 199; *People v Byrne,* 66 AD2d 963, 964; *People v Howard,* 27 AD2d 796). However the People's burden is not as heavy as it might at first appear to be since, in *People v Shompert* (19 NY2d 300, involving an intoxicated defendant), the court stated that a confession will be inadmissible for lack of volitional competency only if the defendant is unable to understand the meaning of his statements.

It must at the outset be recognized that the majority ignores the fact that there is no basis upon which the physical evidence (knives) seized from the defendant could be suppressed. Furthermore, there is no basis upon which all of defendant's statements on June 21, 1972 could be suppressed.

14. The majority (p 286, n 19) contends that the suppression was on constitutional grounds. While the written decision speaks of constitutional rights, Criminal Term nevertheless states: "It is the opinion of this Court * * * that the defendant's attorney relied upon his understanding of the arrangement made with the Assistant District Attorney". In any event, Criminal Term's oral statement *(supra,* p 272) makes clear that the court believed that there was an agreement not to prosecute.

15. The majority (p 286, n 19) points to the failure to obtain suppression of the July 7 and 14 statements concerning the Januszko murder. By any reckoning this can be of no effect in view of the failure to suppress the June 21 admissions. That failure is discussed *infra.*

It is clear beyond cavil that defendant's initial comments to detective Lamardo were voluntarily made while defendant seemed very much aware of his situation. I refer especially to the fact that defendant, at the beginning of his interrogation by Lamardo, after being shown a knife and asked if he heard about the girl that was hurt in Jamaica (obviously alluding to the Januszko homicide) stated: "I think I hurt a girl * * * I cut her." This comment was made before defendant began his bizarre trance-like re-enactment of the Januszko homicide. As to the re-enactments it is not entirely clear that it was incumbent upon counsel to present psychiatric proof of incompetence. It apparently was counsel's position that defendant's demeanor during the re-enactments on June 21 and July 7 and 14, 1972 was such that it was clear that defendant was incompetent to voluntarily make any statement. Evidence to that effect was certainly presented. As to the comment of the hearing Judge that "never mind about the claim of insanity because a competent doctor testified as to the sanity of the defendant", the majority has regrettably taken it out of context. The comment, read in context, shows that it was directed toward the issue of whether there was an agreement with the People not to prosecute.

It must also be pointed out, in any evaluation of counsel's effectiveness, that he did succeed in suppressing the July 7 and 14 statements apparently on the basis that the People had agreed not to use those statements against defendant.

Moreover, and most significantly, even if counsel's failure to call a psychiatrist to testify about the June 21, 1972 statements were to be deemed indefensible, it does not follow that such failure supports a finding that counsel was ineffective.

Counsel raised the issue of the voluntariness of defendant's June 21, 1972 statements at the trial itself, at which there was expert psychiatric testimony. Nevertheless, Criminal Term found, after addressing the issue in depth *(People v Baldi,* 80 Misc 2d 118, *supra),* that defendant's June 21, 1972 statements had been voluntarily made. This fact establishes beyond a reasonable doubt that counsel's error was harmless (see *Chapman v California,* 386 US 18, reh den 386 US 987; *People v Almestica,* 42 NY2d 222; *People v Crimmins,* 36 NY2d 230). This conclusion is not weakened because it is based upon the findings of the fact finder at the trial. As previously indicated the fact finder was a Judge without a jury. While a jury is deemed incapable of separating factors

relating to the voluntariness of a confession from those bearing on guilt or innocence, that is not true of a Judge who may properly preside over a pretrial hearing as well as the trial itself *(Stephens v LeFevre,* 467 F Supp 1026, 1029-1030; *People v Brown,* 24 NY2d 168; *People v Lombardi,* 76 AD2d 891 [decided herewith])*. Therefore, Criminal Term's determination that defendant's June 21 statements to Lamardo were voluntary established beyond a reasonable doubt that any misfeasance by counsel in failing to call a psychiatrist at the *Huntley* hearing was harmless.

Stated otherwise and even without reliance on the harmless error doctrine (cf. *Cuyler v Sullivan,* 446 US 335; *People v Felder,* 47 NY2d 287; *People v Macerola,* 47 NY2d 257), any misfeasance in counsel's conduct of the *Huntley* hearing was obviated by his raising the issue of voluntariness at the trial itself at which he did present psychiatric testimony.

CONCLUSION

The judgments appealed from should be affirmed. Unfortunately the majority by its reversals is tendering an invitation to almost all defendants to raise the issue of ineffectiveness of counsel and announcing to members of the defense trial bar that if they wish to prevent having their representation termed ineffective they would be well advised to avoid any novel or daring strategy moves on behalf of their clients.

COHALAN, J. (dissenting). I commence this brief dissent by stating what the majority appears to concede, namely, that Baldi's guilt as to both indictments was established beyond a reasonable doubt, and overwhelmingly.

His trial court assigned attorney is a man with four decades of experience. He is acknowledged by the Bar to be an expert in the field of criminal law, especially in trial work.

In the two cases before us, he attempted to show at the trial level, albeit unsuccessfully, that in the vernacular of the streets his client was "as nutty as a fruitcake."

As we know, his unconventional defense did not prevail in either the jury or the nonjury case. However, it now appears that even though he is no longer involved, his tactics will have proven to be successful on this appeal, inasmuch as the majority is remanding for new trials. If every time an unusual defense proves unavailing a defendant is to be granted a new trial on the ground of incompetent or ineffective representa-

tion, then the courts will be deluged with motions and appeals. Already the tide is threatening to engulf us. Therefore, if an attorney with 40 years of successful practice is declared, even on an *ad hoc* basis, to be ineffective as an advocate, defendants found guilty after trial will declare open season on their hapless attorneys.

In the factual circumstances of this consolidated appeal, I would affirm.

HOPKINS, J. P., and TITONE, J., concur with LAZER, J.; MARTUSCELLO, J., dissents and votes to affirm the judgments with an opinion, in which COHALAN, J., concurs; COHALAN, J., dissents and votes to affirm the judgments with a separate opinion, in which MARTUSCELLO, J., concurs.

Two judgments of the Supreme Court, Queens County, rendered November 25, 1974 and January 16, 1975, respectively, reversed, on the law, and new trials ordered.