■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ARTHUR GLOVER, Appellant. — Judgment, Supreme Court, Bronx County (Jack Rosenberg, J.), rendered August 4, 1981, convicting defendant after a jury trial of manslaughter in the first degree and sentencing him to an indeterminate term of imprisonment of 8⅓ to 25 years, affirmed. ¶ Despite the defendant's never having suggested during his trial that he was in any way dissatisfied with the representation provided him by his attorney (cf. *People v LaBree,* 34 NY2d 257) and having raised no objection when his counsel assured the Trial Justice that the conduct of the defense was a calculated strategy of both attorney and client, the defendant now contends on appeal that he was denied the effective assistance of counsel. From the thickness of the record the defendant has culled a list of claimed inadequacies. They have been adopted by the dissent

which finds them "failures of performance" that speak for themselves of counsel's lack of a coherent strategy. While we do not find that the trial was error free, we cannot agree with this conclusion. ¶ One claimed failure of performance is counsel's failure to have resubmitted a pretrial omnibus motion that had been denied without prejudice. A rationale for this failure may well lie in the fact that the prosecution supplied most of the discovery requested and counsel may have felt that this adequately informed him of the theory of the prosecution's case. Another claimed failure of performance is counsel's failure to have persisted in his efforts to suppress the defendant's statements to the police which the dissent seems to have found suppressible under *Dunaway v New York* (442 US 200). Defense counsel may have been aware that *Dunaway* stated that it did not " 'involve a situation where the defendant voluntarily appeared at police headquarters' " (p 205). Defense counsel was certainly aware that his client had voluntarily appeared at the police station. ¶ To assess the remaining claims of failure of performance we must bear in mind that defense counsel knew that there was no proof that his client shot the victim, there was no proof that he was even at the site of the shooting, that the evidence was that, although he was in sight of the shooting, he was in a parked car at the time. Given this knowledge, these seeming failures of performance can be accounted for by a calculated strategy of appearing to minimize the prosecution's case by a minimum of defense participation, the theory being that, if no lesser included crimes were charged, the jury would never convict the defendant of murder in the second degree on the evidence available. The proof of the strategy is that it partially succeeded. The jury refused to convict the defendant of murder, second degree. The strategy might have fully succeeded had not the trial court charged manslaughter as a lesser included crime over defense counsel's vehement objection. Such an unorthodox strategy does not constitute ineffective assistance of counsel, even if unsuccessful (*People v Jackson,* 52 NY2d 1027). ¶ In *People v Brown* (45 NY2d 852, 853-854), the Court of Appeals said: "Generally, the ineffectiveness of counsel is not demonstrable on the main record * * * Consequently, in the typical case it would be better, and in some cases essential, that an appellate attack on the effectiveness of counsel be bottomed on an evidentiary exploration by collateral or postconviction proceeding brought under CPL 440.10". In our view, the claimed ineffectiveness of counsel has not been demonstrated from the main record, which is all that we have before us. ¶ We find no merit to the defendant's claim that his sentence was excessive. Concur — Sullivan, J. P., Ross, Silverman and Lynch, JJ.

Carro, J., dissents in a memorandum as follows: It is not exaggeration to say that the courts have been reluctant to overturn convictions upon allegations of ineffective assistance of counsel. The maxim that "defendants are guaranteed a fair trial, not a perfect one", provides some of the basis for this hesitancy, at least insofar as, to quote Locke, "[all] men are liable to error; and most men are, in many points, by passion or interest, under temptation to it."[1] To point out errors, even numerous ones, in defense counsel's handling of a case is, therefore, rarely sufficient to establish a violation of a defendant's Sixth Amendment right to the assistance of counsel. While admittedly such errors may be a good deal more than insignificant misjudgments (*People v Lane,* 93 AD2d 92), when viewed amidst the aggregate of counsel's efforts, they may still be insufficient to downgrade the attorney's representation "below the level of reasonable competence as to justify a conclusion that the defendant was deprived of the effective assistance of counsel." (*People v Lane, supra,* at p 100 [Sandler, J., concurring]; but cf. *Hollin v Sowders,* 710 F2d 264, 269 [ineffective assistance of counsel if loss of significant right by counsel's

1. Essay Concerning Human Understanding (1690).

omission].) ¶ In hand with this reason, is the perhaps more subtle inquiry, illuminated by hindsight, into the conscious strategy of the trial attorney. (Cf. *People v Parch,* 59 NY2d 844, 845; *People v Aiken,* 45 NY2d 394.) As the Court of Appeals recently put it, "Our most critical concern in reviewing claims of ineffective counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy. But trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness. So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met." (*People v Baldi,* 54 NY2d 137, 146-147; see, also, *People v Rose,* 57 NY2d 837, 839.) ¶ Of course, the examination of defense counsel's advocacy under this "meaningful representation" standard is, and must be, at least as critical as the "reasonably competent assistance" formulation now uniformly approved by all Federal Courts of Appeals. (Cf. *Trapnell v United States,* 725 F2d 149 [Feinberg, Ch. J.]; and cf. *Engle v Isaac,* 456 US 107, 134 ["competent attorney"] with *Cuyler v Sullivan,* 446 US 335, 344 [" 'reasonably competent advice' "].) Application of the standard must, at the very least, recognize the tortuous development of the rule and the principled decision to abandon the previous "farce and mockery" test in favor of it. (See, generally, *Trapnell v United States, supra,* pp 150-156.) As the Sixth Circuit observed, "The phrase 'farce and mockery' has no obvious intrinsic meaning. What may appear a 'farce' to one court may seem a humdrum proceeding to another. The meaning of the Sixth Amendment does not, of course, vary with the sensibilities and subjective judgments of various courts. The law demands explanation, so as to ensure the even dispensation of justice." (*Beasley v United States,* 491 F2d 687, 692 [per Celebrezze, J.] [adopting the "reasonably effective assistance" standard].) ¶ Turning to the facts of the case before us, with a view to the totality of counsel's advocacy on defendant's behalf, we can neither conclude that defendant received meaningful representation from that attorney, nor can he be said to have rendered reasonably competent assistance to the accused. While, as noted above, the number of errors is in itself unpersuasive, we find the eight separate failures of performance here to amount to the deprivation of a fair trial by counsel's ineffective representation. ¶ Defendant, a "pimp", was indicted for murder in the second degree and criminal possession of a weapon in the second degree. The indictment alleged that Glover "acting in concert with others * * * caused the death of said Edgar Nicks by shooting him with a firearm." (Count one.) Counsel filed an omnibus discovery motion seeking, among other things, specification of each overt act attributable to Glover and whether or not appellant was alleged to have had actual possession of the firearm referred to in both counts of the indictment. Finding the motion to be both premature and overbroad, the court denied with leave to renew the motion in a form consonant with the local rule. This counsel failed to do. ¶ The victim was shot on July 1, 1980. On July 11 the defendant came into the 41st Precinct and allegedly made a statement to the effect that he had heard that another pimp (Nicks) had been murdered and that Nicks had broken his nose about a month earlier because he had taken one of his prostitutes. At a *Huntley* hearing Detective Maroney further testified that defendant admitted he had threatened to "fuck up" Nicks because of this incident, but had never carried out his threats and found out about the murder the day after it happened. ¶ The hearing court ruled that defendant was in custody when this statement was taken. Counsel agreed, but then failed to take the logical next step and move to suppress the statements. (Cf. *Dunaway v New York,* 442 US 200.) Rather,

when asked by the court if he had any questions with reference to the statement he replied, "No, I'm satisfied."[2] The statements were then ruled to have been voluntarily given after a knowing waiver, and were admissible. ¶ At trial the detective repeated his testimony, reading the statement from a DD-5 (which was never admitted into evidence). Counsel then asked for a recess, which the court granted, to review the Grand Jury minutes, with the court advising counsel to "read the minutes as to this witness * * * and I will explain to you why." The court was a bit chagrined to later find out that defense counsel had had the minutes for over a week, but had not bothered to read them. ¶ The key witness was a prostitute who had been Glover's "woman" and was with him the night of the murder. Her testimony placed defendant in a car across the street from Nicks, observing the slaying. She claimed defendant had threatened to "take him [Nicks] off the count" in retaliation for the broken nose, but he was going to hire someone named "Cisco" to do it for him. ¶ According to her testimony, Nicks was changing a tire at 2:30 in the morning when three men walked up and shot him. She didn't recognize anyone but when defendant pulled the car around the corner, two men got in, one of whom was "Cisco." Defendant passed a small brown bag to Cisco, and later on, someone threw a larger bag out the window. After 45 minutes to an hour, Cisco and the other man got out and she went home with appellant. ¶ Cross-examination consisted of about five questions, determining that she didn't see what was in the paper bag, defendant didn't pull the trigger, and that she was a prostitute who formerly used drugs, all of this information had already been brought out on direct examination. ¶ The next witness, Bowser, also a pimp who had known Nicks but not defendant, testified that he was there when the murder occurred. Allegedly he was sitting in his car at 2:30 in the morning when Nicks came up and asked him if he could borrow his spare tire. Bowser got out and let Nicks take the tire from the trunk. While Nicks rummaged around for a jack, Bowser walked to the corner to check one of his prostitutes when he heard what sounded like "firecrackers." Turning back to his car, someone came at him, yelling, "You, too, run," and fired again (twice) at him. Bowser ran, fell, and when he did get up, he saw a car come from an alley to pick up the man who shot at him. The car drove away and Bowser returned to his car and Nicks' riddled body. At the conclusion of direct examination, defense counsel simply stated that he had no questions: "THE COURT: You have no questions at all? DEFENSE COUNSEL: No, none." ¶ The People then rested. Defense counsel wanted to rest, too, but the court queried: "Before you rest don't you make any motions? This is on the People's case, not the resting." Counsel made a brief motion to dismiss "on the ground the People failed to establish a prima facie case * * * the evidence is flimsy * * * They got three other unknown men; let them get the other three unknown men instead of picking on this guy." ¶ The prosecutor responded with a summation of the two eyewitnesses' testimony and the detective's relation of Glover's statement. Defense counsel remained mute, so the court pointed out the inconsistencies, finally reserving decision until the following afternoon so defense counsel could do some research on the issues of intent and sufficiency of the evidence. Of course, none was submitted. ¶ The following morning the following colloquy was had: ¶ "THE COURT: Gentlemen, first, as I stated off the record, I'll put it on the record now, I have read the minutes, Defense Counsel. ¶ "DEFENSE COUNSEL: Yes. ¶ "THE COURT: And that is the minutes that were given to me by the Official Court Reporter which went up to the last witness — up and through Angela Smith. From what I read, there are areas in which there could have been cross-examination of the officer, for example, and Angela Smith

---

2. Counsel somehow saw these as positive evidence, stating: "They're exculpatory. I accept them. Very nice; they're in my favor."

particularly, in some areas such as her knowledge of the person who she says was the deceased. ¶ "I recognized, Defense Counsel, your years of experience. ¶ "DEFENSE COUNSEL: Yes. ¶ "THE COURT: And maturity in this particular area and I've assumed now that any failure to cross-examine in certain areas was a calculated ¶ "DEFENSE COUNSEL: It surely was; definitely. ¶ "THE COURT: — desire based upon your belief and your client's belief in how this case should be tried; is that correct? ¶ "DEFENSE COUNSEL: That is correct. ¶ "THE COURT: Your understanding, as I told you, that in the interest of justice, I would be prepared since there — this was a short case, to open up any witness to give you a further opportunity to cross-examine if you wanted such. ¶ "DEFENSE COUNSEL: Do not. ¶ THE COURT: I also recall that we discussed the possibility and I directed this Officer Moroney — Detective Moroney be kept here for any further cross after you read the Grand Jury minutes or whatever reading matter that was presented to you — the records, exhibits, after you had completed such, if you wanted to further cross-examine him. ¶ "DEFENSE COUNSEL: No, do not. Thank you. ¶ "THE COURT: I understand you do not want further cross; is that correct? ¶ "DEFENSE COUNSEL: That's correct." The court went on: "I intend to tell the jury before — well, opening this afternoon, that they are not to misinterpret the officer's testimony, specifically as to the fact that he referred to a DD5 that's not in evidence to start with * * * I'm doing that because, frankly, no objection was made on any point at the time and I'm doing this *sua sponte* in the interest of justice that they should not consider it in bolstering and we understand it." ¶ Then noting its own "grave reservations" about the sufficiency of the evidence, the court determined not to dismiss the case before the jury rendered its verdict. Counsel renewed his motion to dismiss but again made no legal argument, so the discussion turned to what the jury charge should consist of. Defense counsel saw no need for either an interested witness charge or one on conflicts in the testimony. Counsel objected to a lesser included charge to manslaughter in the first degree, and then, as an afterthought, requested an interested witness charge — as to the police officer, not either of the two eyewitnesses. Later, prior to summations, the court indicated that it would charge to the manslaughter, to which defense counsel took an exception. Counsel again moved to dismiss for failure to prove guilt beyond a reasonable doubt. The court reserved decision, observing that no law had been submitted to him yet. ¶ The following day the jury received its charge. After requesting the testimony of the eyewitnesses a verdict was returned finding Glover guilty of manslaughter in the first degree. ¶ At sentence, the court then formally denied the motion to dismiss for sufficiency of the evidence, noting that all of the damaging evidence had been "uncontroverted by the defense." Then, in what can only be termed an extraordinary statement, the court made the following reflection upon the trial: "Now, with much unhappiness since I do have personal regard I could say for both counsel, certainly for counsel for the defendant who is a man known to me for a good number of years now, and a lawyer of maturity and seniority I feel impelled though to point out certain factors to the Appellate Court for their own consideration. The record will show that counsel elected to enter his client's defense in an effort to establish only that there was a lack of sufficient evidence to sustain a crime beyond a reasonable doubt of his client's guilt. The testimony of his involvement in the crime consisted substantially of circumstantial evidence and admissions defendant made to a Police witness as well as a civilian * * * indicating that he, the defendant, had good reason to bear ill will to the deceased victim of the shooting and to seek retribution from the victim. In addition, the Police testimony as I have already indicated and that of the former girl friend, Angela Smith, by name, a prostitute, about defendant's behavior and statements relating to such retribution and the intended hiring

of an enforcer and as to defendant's behavior on the day of the crime and his presence there at the scene of the shooting and his contact after the crime with two other men and his delivery to one of the men the alleged enforcer of a small brown envelope or bag, the contents of which were never disclosed at the trial or known to the witness and further in addition testimony of Angela Smith that where the car that she and the defendant were in at the time of the crime and after the crime and as to where the two men entered the car were seen was corrected by a third witness who like the victim and the defendant was also a pimp. Her testimony as to the two men who after the shooting entered the car to join her and the defendant and after which he drove away from the scene of the crime and the route by which they did so down a street also seemingly could have been contradicted by the testimony by other people who spoke of one man with a gun who entered the car coming out of an alley. In addition, there is no deduction of any evidence relating to the background of Angela Smith in the viewpoint of promises, possible promises in the case as to immunity or other areas. No in-depth indication of bad character background except I think it was brought out that she had been prostituting. Yet despite these important discrepancies defense counsel failed to cross examine these witnesses on these factors and their testimony nor raise any legal objections to questions and interpretation made by Police Officers testimony as to defendant's alleged admission made to the Officer. That is whether there could have been fairly a different interpretation as evidently put forth by the Officer as to the intended meaning of the being subject by the defendant by the victim over a matter of a prostitute. Although the record will indicate that this Court offered further opportunity to do so, even after the People's case had been concluded the witnesses had been officially terminated in their testimony. The Court offered to bring these witnesses back for further cross-examination if counsel saw fit. *These actions by defense counsel have caused this Court to give serious consideration to whether the verdict of guilty should be allowed to stand.* See People against Baldi, 76 A.D.2d 259 and 279. In the instant case may well be that defendant's counsel based his strategy at the outset of trial as he indicated called for no aggressive attack on some of the witnesses against his client but his persistence in that strategy came away with questionable character and background on two of the major witnesses against his client in that the testimony of one of the defendant's former girl friends contained a substantial internal contradiction in that to the extent that it was inconsistent with the testimony of other known Police witnesses certainly raised or raises a question as to whether such conduct might not constitute a denial of defendant's constitutional right to counsel. To the issue although may be a close one which in the view of this Court and the light of its careful examination and of previous precedents cannot be held to require a declaration of the setting aside of the verdict. Rather, it is one left for the review of the Appellate Court * * * *Now, I have just pointed all of these items out because I felt it is my obligation in the interest of justice to the defendant and in the interest of justice basically to indicate to the Appellate Court that I recognize certain factors and as for the reasoning I did not act other than I now act in a totally different manner in denying the application of the defendant to set aside for any reason.* Also, it would not be a happy event if another application was made before this Court on the basis of the issue of counsel * * * then we would be wasting a great deal of unnecessary time which the Appellate Court will not be wasting since I am certain that there will be an appeal taken here and that they can then review all possible factors or points" (emphasis supplied). ¶ Little more need be said. We have quoted the record so extensively because it does, in effect, "speak for itself" as to counsel's total lack of coherent strategy, much less an ineffective one. We are as wary of being "Monday morning quarterbacks" as we are

reluctant to overturn a conviction of this kind, with the necessary requirement that the indictment be dismissed. (*People v Beslanovics,* 57 NY2d 726, 727.) But we do so, however reluctantly, upon the conviction that neither the integrity of our system of justice nor this defendant's right to meaningful representation by competent counsel was adequately served. ¶ Accordingly, the judgment rendered August 4, 1981, in Supreme Court, Bronx County (Jack Rosenberg, J.), convicting defendant of manslaughter in the first degree, should be reversed and the indictment dismissed.